**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| C. B., a minor,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>CITY OF SONORA; MACE MCINTOSH,<br>Chief of Police; HAL PROCK,<br>Officer,<br>*Defendants-Appellants*. | No. 11-17454<br><br>D.C. No.<br>1:09-cv-00285-<br>AWI-SMS<br><br><br>OPINION |

Appeal from the United States District Court
for the Eastern District of California
Oliver W. Wanger, Senior District Judge, Presiding

Argued and Submitted En Banc
March 17, 2014—San Francisco, California

Filed October 15, 2014

Before: Alex Kozinski, Chief Judge, and Diarmuid F.
O'Scannlain, Sidney R. Thomas, Barry G. Silverman,
Susan P. Graber, Ronald M. Gould, Richard A. Paez,
Marsha S. Berzon, Richard C. Tallman, Jay S. Bybee and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Paez as to all but Part II.C.1.;
Opinion by Judge M. Smith as to Part II.C.1;
Partial Concurrence and Partial Dissent by Judge M. Smith;
Concurrence by Judge Gould;
Partial Concurrence and Partial Dissent by Judge Berzon

# SUMMARY*

## Civil Rights

The en banc court affirmed in part and reversed in part the district court's judgment entered following a jury trial, in an action arising out of a decision by Sonora City Police Department officers to handcuff and remove from school grounds C.B., an 11-year-old child with attention-deficit and hyperactivity disorder who was sitting on a bench and refused to leave the playground.

The en banc court held that the 2003 amendment to Fed. R. Civ. P. 51 abrogated prior case law that denied review of jury instructions in civil cases in the absence of a timely objection. The en banc court held that the plain error standard of review in the civil context is similar to, but stricter than, the plain error standard of review applied in criminal cases. When reviewing civil jury instructions for plain error, a court must consider, as in the criminal context, whether (1) there was an error; (2) the error was obvious; and (3) the error affected substantial rights. The en banc court held that it is appropriate to consider the costs of correcting an error, and—in borderline cases—the effect that a verdict may have on nonparties. Finally, the court also held that the decision whether to correct a plain error under Federal Rule of Civil Procedure 51(d)(2) is discretionary.

The en banc court concluded that defendants had not identified any plain error in the district court's jury

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

instructions, that the district court's evidentiary rulings were not an abuse of discretion, and that defendants had not shown they were entitled to a settlement offset.

The en banc court further held that defendants Chief McIntosh and Officer Prock were not entitled to qualified immunity on C.B.'s Fourth Amendment excessive force claim because no officer could have reasonably believed that their use of handcuffs to remove C.B. from school grounds complied with the Fourth Amendment.

The en banc court held that Chief McIntosh and Officer Prock were entitled to qualified immunity with respect to C.B.'s unlawful seizure claim because a reasonable officer would not have known that taking a child in C.B.'s situation into temporary custody was unreasonable, and therefore unconstitutional.

Concurring in part and dissenting in part, Judge M. Smith, was joined in full by Judges O'Scannlain, Tallman and Bybee, and was joined as to Part I, which is the opinion of the court, by Judges Kozinski, Graber and Gould. In Part I of his opinion, Judge M. Smith stated that a majority of the court agreed that Chief McIntosh and Officer Prock were entitled to qualified immunity with respect to C.B.'s unlawful seizure claim. In Part II of his opinion, Judge M. Smith dissented from the majority's conclusion that the scope of C.B.'s right to be free from excessive force was clearly established. In his view, the officers were entitled to qualified immunity on the excessive force claim because a reasonable officer would not have known that handcuffing C.B. to safely take him into temporary custody violated his constitutional rights.

Concurring in part, Judge Gould, with whom Judges Kozinski and Graber joined, agreed with Parts I, II.A, II.B, II.C.2, and II.D of Judge Paez's opinion, concerning the factual background, rejection of the challenges to jury instructions and to evidentiary rulings, and the conclusions that Chief McIntosh and Officer Prock used excessive force in violation of the Fourth Amendment when, in removing C.B. from school grounds, they handcuffed him for 25 to 30 minutes and that they were not entitled to qualified immunity for handcuffing C.B. Judge Gould joined in Part I of Judge M. Smith's opinion, concerning the unlawful seizure claim, concluding that the officers were entitled to qualified immunity as to the seizure of C.B.

Concurring in part and dissenting in part, Judge Berzon, joined by Judge Thomas, agreed with Judge Paez's opinion, with one exception: As to C.B.'s unlawful seizure claim, she concurred in the result reached by Judge Paez but would reach that result via different reasoning. Because there was no cause to believe C.B. could be detained under the relevant California Welfare Code provisions, and no reasonable officer could believe that there was, she would affirm the judgment for C.B. on these grounds.

Dissenting in part, Judge Paez in Part II.C.1 of his opinion, joined by Judge Silverman, disagreed that Chief McIntosh and Officer Prock were entitled to qualified immunity on C.B.'s Fourth Amendment seizure claim. Judge Paez stated that the officers' decision to seize C.B. and remove him from school grounds was not reasonable and the law was clearly established that, at a minimum, police seizures at the behest of school officials had to be reasonable in light of the circumstances and not excessively intrusive.

**COUNSEL**

Stephanie Y. Wu (argued) and Cornelius J. Callahan, Borton Petrini LLP, Modesto, California, for Defendants-Appellants.

Julia Levitskaia (argued), John F. Martin, and Georgelle Christina Heintel, Law Offices of John F. Martin, Walnut Creek, California, for Plaintiff-Appellee.

**OPINION**

PAEZ, Circuit Judge:

This case arises out of a decision by Sonora City Police Department officers to handcuff and remove from school grounds an 11-year-old child with attention-deficit and hyperactivity disorder ("ADHD") who was doing nothing more than sitting quietly and resolutely in the school playground. After a seven-day trial, a jury found that the City of Sonora, Sonora Chief of Police Mace McIntosh, and Officer Harold Prock (collectively "Defendants") were liable for violating C.B.'s Fourth Amendment rights and for tortious acts. The district court subsequently entered judgment on the verdict, and Defendants appeal.

We must decide two central issues. First, we must decide whether the district court's supplemental jury instructions were proper. To resolve this question, we also must determine whether litigants may object to civil jury instructions for the first time on appeal and, if so, what standard of review governs such challenges. Second, we must decide whether the district court erred in denying the individual officers qualified immunity on C.B.'s

constitutional claims. Additionally, Defendants raise several evidentiary and post-judgment arguments, which we also address. After setting forth the factual and procedural background of the case, we turn to the district court's supplemental instructions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.

On September 28, 2009, sixth-grader C.B. was having a "rough" day at school. C.B. had been diagnosed with ADHD and took prescribed medications to manage his symptoms, but that morning, he had forgotten to take his medications. As a result, he experienced periods of unresponsiveness throughout the day; C.B., his parents, and school officials described this as C.B. "shutting down." The school was aware of C.B.'s ADHD and had an accommodation plan under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, in place for him. The accommodation plan designated Coach Karen Sinclair's office as a safe space where C.B. could go if he was experiencing a "shut down," to calm himself and refocus until he was ready to return to class.

Unfortunately, that day, things did not unfold according to plan. When C.B. experienced a "shut down" during recess, Coach Sinclair tried to convince him to go to her office, but C.B. remained unresponsive and refused to leave the playground. According to Coach Sinclair, during this exchange, C.B. "reared up" on three different occasions from the bench where he was sitting. Coach Sinclair then advised C.B. that if he did not come inside, she would call the police. To this, C.B. allegedly responded by saying, "call them."

C.B., however, testified that he never moved from the bench or said anything to Coach Sinclair during this interaction.

Coach Sinclair testified that she made the decision to call the police because she was concerned about C.B.'s safety. She explained that her concern was based on an incident two years earlier, during which C.B. had stated that "he was tired of feeling the way he felt and he wanted to go out into traffic and kill himself." Coach Sinclair was particularly concerned because the street outside the schoolyard was a busy thoroughfare. Coach Sinclair admitted, however, that C.B. had never previously attempted to run from her.

At Coach Sinclair's behest, police were called. The police dispatcher broadcast notice to the officers of "an out of control juvenile." When Chief McIntosh arrived at the playground, Coach Sinclair whispered to him, "[r]unner[,] [n]o medicine," and made corresponding hand signals. Chief McIntosh testified that he then sat down next to C.B. and attempted to engage him in conversation, but C.B. was unresponsive. He further testified that Coach Sinclair then "started telling [him] that [C.B.] was out of control, had not taken his medications, was yelling and cussing." She also advised Chief McIntosh that she no longer wanted C.B. on the school grounds. Chief McIntosh did not ask any follow-up questions about C.B.'s medications or behavior. C.B. remained completely quiet and unresponsive throughout the time Chief McIntosh was with him.

Coach Sinclair's testimony contradicted much of Chief McIntosh's account. She did not remember Chief McIntosh ever making any effort to engage C.B. in conversation. Beyond her initial statement that C.B. was a "runner" who had not taken his medication, she could not recall conveying

any other information to the police until she was subsequently asked whether she wanted C.B. removed from the school grounds, to which she said yes. Specifically, she testified that she did not inform the police why she thought C.B. might run, what medications he was on, C.B.'s history, or what had transpired earlier that day. C.B. recalled Coach Sinclair telling Chief McIntosh only that he was a "runner."

Within a few minutes of Chief McIntosh's arrival, Officer Prock arrived. He testified that when he arrived, C.B. was sitting quietly, looking at the ground. Coach Sinclair also advised him that C.B. was a "runner," but Officer Prock did not learn that C.B. had not taken his medication until much later. Officer Prock tried to engage C.B. in conversation, but he remained unresponsive.

About three and a half minutes after Officer Prock arrived, Chief McIntosh signaled that Officer Prock should handcuff C.B. Officer Prock ordered C.B. to stand up, which he did immediately. He then instructed C.B. to put his hands behind his back—which C.B. again did immediately—and handcuffed him. Notwithstanding the fact that C.B. had not disobeyed a single police order, the officers did not explore alternative options for handling the situation before handcuffing him. When Officer Prock handcuffed C.B., C.B. began to cry, believing that he was being taken to jail.

Once C.B. was handcuffed, the officers and Coach Sinclair escorted him off the playground. Officer Prock then pulled his police vehicle around and directed C.B.—still in handcuffs—into the back seat. C.B. complied immediately. During this entire time, no one spoke to C.B. or explained to him why he had been handcuffed, that he was not under arrest, or where the police were taking him. Officer Prock

then transported C.B. to his uncle's business.[1]  Although Officer Prock's vehicle was equipped with safety locks, making it impossible for C.B. to escape, C.B. remained handcuffed during the approximately thirty-minute ride to his uncle's place of business.  C.B. testified that the handcuffs caused him pain and left red marks.

Coach Sinclair, who was also the school disciplinarian, testified that in the three years before this incident, she had summoned police to Sonora Elementary School about fifty times.  Of those fifty times, police used handcuffs about twenty times, even though about thirteen of those twenty instances did not involve any known or suspected criminal activity.  When Officer Prock was handcuffing C.B., Coach Sinclair asked whether the handcuffs were "really necessary," to which one of the officers replied that it was "procedure."[2] She further testified that she knew this was the police department's procedure because, in her experience, "any time that the police have to take a child off of campus, whether it be medical, drugs, fight, the child is handcuffed."  Officer Prock also testified that he understood the police department's policy to permit officers to handcuff any individual they were transporting in the back of a police vehicle.

---

[1] According to Officer Prock, when he called the business number on C.B.'s emergency contact list, C.B.'s uncle advised him that C.B.'s parents were out of town and unreachable and that he was currently taking care of C.B.

[2] At trial, Chief McIntosh and Officer Prock did not recall this exchange.

Following this incident, C.B. experienced a host of psychological and emotional problems, including difficulty sleeping, low self-esteem, anger, irritability, and depression.

**B.**

C.B. filed this action against the Sonora School District, Coach Sinclair, the City of Sonora, Sonora Chief of Police McIntosh, and Officer Prock, alleging violations of his Fourth Amendment rights, the Americans with Disabilities Act, the Rehabilitation Act, and a number of state law tort claims. C.B. settled his claims against the Sonora School District and Coach Sinclair. After the district court denied Defendants' motion for summary judgment on the basis of, *inter alia*, qualified immunity, the case proceeded to trial against the City of Sonora, Chief McIntosh, and Officer Prock on the following claims: unlawful seizure and excessive force in violation of the Fourth Amendment under 42 U.S.C. § 1983 and false arrest and intentional infliction of emotional distress ("IIED") under state law.

On the sixth day of trial, the jury returned its first verdict, determining that: (1) Defendants were not liable for either § 1983 claim; (2) C.B. had proved that Chief McIntosh's and Officer Prock's conduct intentionally caused him emotional distress, and C.B. suffered harm as a result; (3) Chief McIntosh and Officer Prock had established privilege, an affirmative defense to the IIED claim; and (4) C.B. was entitled to damages on the IIED claim. The verdict form also left unanswered the verdict on the false arrest claim. Realizing that the verdict on the IIED claim was internally inconsistent, the district court proposed resubmitting the case to the jury with clarifying instructions. Specifically, the court recommended explaining to the jury that: (1) if it were to

find the affirmative defense of privilege, it could not award damages for IIED; (2) Question 11C, rather than Question 11D, corresponded to the IIED damages; and (3) it must answer the question about false arrest. Counsel for both sides agreed.

The court next addressed the jury, explaining that the verdict contained "an inconsistency" and instructing the jury that "[i]f you don't find the [affirmative defense of] privilege, then you can award damages, but you can't award damages if you find that the conduct is privileged." The court also noted a typographical error on page 9 of the verdict form regarding where the jury was to record damages, if any, for IIED, and directed the jury that it needed to respond to the question about false arrest.[3] After this instruction, the jury again began deliberating.

Not long thereafter, the jury sent the judge the following written question:

> Clarify question 8
>
> if we said yes to all on page 23 of Jury Instruction #20 doesn't that mean we answer yes to page 9 in verdicts of trial jury?

Jury Instruction 20 set out the elements of the affirmative defense of privilege to the IIED claim, and Question 8 on page 9 on the verdict form asked for the jury's verdict on whether the officers' conduct was privileged. At a

---

[3] Although the court said that it would provide corrected verdict forms, the final verdict form still referenced the wrong damages question in relation to the IIED claim.

conference with counsel, the court proposed answering the question in the affirmative. Counsel for Defendants requested that the court also explain again that if the jury were to find privilege, it must move on to the next claim and not award damages for IIED, which the court agreed to do.

When the jury returned to the courtroom, the court described the framework for IIED claims. The court first explained C.B.'s case-in-chief. Then, it discussed the three elements of the affirmative defense of privilege, as set out in Jury Instruction 20, stating that "if you find yes as to all of those three things, in light of the elements of the intentional infliction of emotional distress, that is called a complete defense and it eliminates liability for damages." Turning specifically to the jury's question, the court further explained, "so your inquiry here on question number . . . 8, which is the affirmative defense[,] is have the defendants proved the things that are required to be proved on page 23, which is jury instruction 20, the privilege defense." Having clarified that Question 8 on the verdict form corresponded to Jury Instruction 20, the court again discussed the relationship between a finding of privilege and damages. Finally, the court reminded the jury that it needed to answer the question about false arrest, and indicated that it would provide a new page 11 of the verdict form because of a second typographical error.[4]

---

[4] Question 10, on page 11 of the verdict form, concerned probable cause, the affirmative defense for the false arrest claim. Earlier, C.B.'s counsel had advised the court that the verdict form incorrectly directed the jury to answer Question 11D, the damages question for false arrest, if it found that Defendants had proved probable cause. The court agreed that the instruction should have read: "'If you answer yes as to any defendant' – then it should be do not answer 11D. If you answer the question no as to – it should be either defendant, answer question 11D." Consequently,

The jury then asked a follow-up question while it was still in the courtroom.

> JUROR SEAT NUMBER EIGHT: Okay. So the fact that we answered affirmative yes to questions 6 and 7.
>
> THE COURT: Yes.
>
> JUROR SEAT NUMBER EIGHT: I guess our question is how does that affect our response to number 8? Is it conflicting?

Questions 6 and 7 asked whether C.B. had met his burden of proof on the elements of IIED. The jury was essentially asking whether it could find that C.B. proved his case-in-chief and still find that Defendants proved their affirmative defense.

The court responded by again explaining the framework for IIED claims. Noting that the jury had effectively found that C.B. met his burden of proving liability, the court explained that "then the question becomes is there an award of damages." The court went on: "However, under the law, the defendants are entitled to assert what is called an affirmative defense. And an affirmative defense has the legal effect of negating the finding of liability." While not the most direct response, this statement informed the jury that it could, in fact, answer yes to Questions 6 and 7 and still find privilege. The court again set out the elements of privilege,

---

after responding to the jury's question, the court advised the jury of this error and indicated it would provide a corrected page 11. The final verdict form does, in fact, reflect the correct instruction on page 11.

concluding by telling the jury that "[i]f you find those things, then that negates, if you will, the intentional infliction of the emotional distress."

Juror Number 8, apparently still confused, asked, "[a]nd that is not a conflict?" To this, the court responded:

> It's not a conflict because it's an affirmative defense. It's potentially a conflict depending on what you think of the conduct and the states of mind. But that's for you to determine. In other words, you have to decide what -- what was being thought, what was observed and what was being done under the totality of the circumstances, recognizing what the law is that tells the officers what they can and can't do in dealing with the plaintiff.
>
> Remember, this is measured objectively by what a reasonable officer in the position of the two defendants would do knowing everything that they knew on the scene with what was happening there. It's an objective standard.
>
> And this, particularly, examines their conduct in light of the law, in light of what they knew and what they, in good faith, believed and what they did. And so, there is a potential inconsistency, but that depends on what you find the intentions, the states of mind are and the conduct is in light of the law. And you're the only people who can make those decisions. We cannot tell you how to do

> it. The attorneys have told you how to do it in
> their arguments, but it's for you to make the
> ultimate decisions.

Again, the court's explanation, although somewhat long-winded, made clear that a finding of privilege was consistent with a finding of IIED if the facts sustained Defendants' assertions. Shortly after asking another question about privilege, the jury went home for the evening.

The following morning, at a conference outside the jury's presence, Defendants' counsel urged the court to instruct the jury to resume their deliberations with Question 9. The court rejected the requested instruction. Instead, it proposed to instruct the jury "simply to re-deliberate on the questions that are still open." Once the jury entered the courtroom, the court stated that it "wanted to review briefly where we are so that hopefully you understand and are clear." The court instructed the jury as follows:

> [O]ur suggestion to you is that you consider
> the findings that you've made to the prior
> questions, you consider the evidence in light
> of the instruction that you're being asked to
> answer when you are on the verdict form.

> And that is you have questions 6 and you
> have questions 7, which you've already
> answered. You've answered question 8. And
> then you have correct instructions on question
> number 8 as to which questions you should be
> answering in question 11. You then have a
> claim that you've not decided, and that is the

false arrest claim.  And that's question 9A and
B.  And you have a revised instruction on that.

The court then discussed in greater detail some changes that
were made to the instruction regarding false arrest.
Following this supplemental instruction, the jury requested to
receive the prior day's instructions on privilege again,
indicating "that's where we're really fighting right now."

At a sidebar with counsel, the court advised the parties
that it would make "an overarching statement" to "consider[]
the elements affirmatively and defensively on each side."
The court began by summarizing all of the claims, stating:

> You have four claims that are brought by
> the plaintiff.  You have two civil rights
> claims.  One for the use of excessive force and
> one for the use -- or the unlawful seizure in
> the taking into temporary custody and the
> length of the detention and all the
> circumstances of the detention that the
> temporary custody involved.
>
> Those are federal claims.

After this brief mention of the federal claims, the court
focused on the state law claims and affirmative defenses.
With respect to IIED, the court stated:

> And so, in looking at the two state claims,
> you have the intentional infliction of
> emotional distress.  And then, in jury
> instruction number 20, you have the defense

of privilege and the elements that have to be proved by a preponderance of the evidence.

So when you are considering that defense, you consider the totality of the circumstances. You consider what went in to the claims that you analyzed, the elements of those claims and all the evidence that bears on that. Then you analyze the elements of the defense, all the evidence that bears on that.

And there should be consistency -- and that was your concern -- between those findings. The consistency is a function of how you find the facts, which evidence you believe, how much weight you give to the evidence.

Then, the court went on to address false arrest.

The jury deliberated for about four more hours before returning a verdict for C.B. on all claims. The district court denied Defendants' motions for judgment as a matter of law, a new trial, and remittitur and entered judgment in favor of C.B.

Defendants appeal, arguing: (1) the district court's supplemental jury instructions were so coercive and confusing as to warrant a new trial; (2) the individual officers are entitled to qualified immunity with respect to C.B.'s § 1983 Fourth Amendment claims; (3) several of the district court's evidentiary rulings were erroneous and warrant reversal; and (4) the district court erred in denying an offset against the overall damages award by the amount of C.B.'s

settlement with the Sonora School District. Without specifying the standard of review it applied, a three-judge panel of this court unanimously held that the district judge's supplemental jury instructions and colloquy were sufficiently misleading as to require a new trial. *C.B. v. City of Sonora*, 730 F.3d 816, 823–24 (9th Cir. 2013); *see also id.* at 827 (McKeown, J., dissenting) (agreeing with the majority on this point). In a split decision, a majority of the panel also held that the individual officers were entitled to qualified immunity. *Id.* at 824–27 (Maj. Opin.); *see also id.* at 827–31 (McKeown, J., dissenting).[5] Upon a majority vote of eligible judges, the court granted rehearing en banc. *C.B. v. City of Sonora*, 755 F.3d 1043 (9th Cir. 2014).

## II.  DISCUSSION

### A.

### 1.

We must first decide the standard of review that governs Defendants' challenge to the district court's jury instructions. Historically, we have refused to review jury instructions in a civil case in the absence of a timely objection under Federal Rule of Civil Procedure 51(c). *See Voohries-Larson v. Cessna Aircraft Co.*, 241 F.3d 707, 713–14 (9th Cir. 2001); *Larson v. Neimi*, 9 F.3d 1397, 1399 (9th Cir. 1993). In 2003, however, Rule 51 was amended to provide for plain error review when a party fails to preserve an objection. Fed. R. Civ. P. 51 advisory committee's note. We have since

---

[5] Because the three-judge panel opinion vacated and remanded for a new trial, it did not reach the remainder of Defendants' arguments. *C.B.*, 730 F.3d at 824 n.4.

indicated, in dictum, that this amendment abrogated our prior case law, *see Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1230 n.5 (9th Cir. 2011), and we now so hold. We also take this opportunity to clarify the scope of plain error review under Rule 51. We conclude that the plain error standard of review in the civil context is similar to, but stricter than, the plain error standard of review applied in criminal cases.[6]

Federal Rule of Civil Procedure 51(d)(2) states that "[a] court may consider a plain error in the instructions that has not been preserved as required by Rule 51(d)(1) if the error affects substantial rights." The advisory committee's note explains that subsection (d)(2) was adopted to capture the existing rule in many of our sister circuits that errors in jury instructions not preserved under Rule 51(d) "may be reviewed in exceptional circumstances." Fed. R. Civ. P. 51 advisory committee's note. Although the precise rule varied somewhat from circuit to circuit, most of our sister circuits at the time applied a standard of review that resembled the plain

---

[6] Although we have previously refused to review jury instructions in the absence of a timely objection at trial, we have reviewed for plain error evidentiary, closing argument, and attorney misconduct challenges that were not contemporaneously raised at trial. *See, e.g.*, *Settlegoode v. Portland Pub. Sch.*, 371 F.3d 503, 516–17 (9th Cir. 2004); *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002); *Bird v. Glacier Electric Coop., Inc.*, 255 F.3d 1136, 1148 (9th Cir. 2001); *Beachy v. Boise Cascade Corp.*, 191 F.3d 1010, 1016 (9th Cir. 1999); *McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 357 n.9 (9th Cir. 1996). The standard that we adopt now for reviewing belated objections to civil jury instructions is consistent with our standard for reviewing other untimely objections in civil cases.

error standard in criminal cases.[7]  Moreover, "[t]he language adopted to capture these decisions in subdivision (d)(2) is borrowed from [Federal] Rule [of Criminal Procedure] 52." Fed. R. Civ. P. 51 advisory committee's note; *see also* Fed. R. Crim. P. 52(b).  Finally, the advisory committee's note suggests that the plain error standard of review in the criminal context should inform our inquiry.  *See* Fed. R. Civ. P. 51

---

[7] *Compare United States v. Olano*, 507 U.S. 725, 732 (1993) (explaining that before a court will consider a forfeited objection in the criminal context, "[t]here must be an 'error' that is 'plain' and that 'affect[s] substantial rights,'" and, even then, "the decision to correct the forfeited error [is] within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings'" (some alterations in original) (quoting *United States v. Young*, 470 U.S. 1, 15 (1985))), *with Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 61 (2d Cir. 2002) (explaining that in the civil context review is limited to "fundamental error," which is an error that is "so serious and flagrant that it goes to the very integrity of the trial" (internal quotation marks omitted)), *Babcock v. Gen. Motors Corp.*, 299 F.3d 60, 64–65 (1st Cir. 2002) (recognizing that reversal for plain error in the civil context requires that "(1) there be error; (2) the error was 'plain' (i.e.[,] obvious and clear under current law); (3) the error affected substantial rights; and (4) the error threatened a miscarriage of justice"), *Cozzo v. Tangipahoa Parish Council–President Gov't*, 279 F.3d 273, 293–94 (5th Cir. 2002) (stating that to reverse for plain error in civil jury instructions, the court "must find an obviously incorrect statement of law that was probably responsible for an incorrect verdict, leading to substantial injustice"), *Black v. M & W Gear Co.*, 269 F.3d 1220, 1232 (10th Cir. 2001) ("[T]his court will not review instructions given to which no objections were lodged before the jury retired for deliberation unless they are patently plainly erroneous and prejudicial." (internal quotation marks omitted)), *and Fashauer v. N.J. Transit Rail Operations, Inc.*, 57 F.3d 1269, 1289 (3d Cir. 1995) ("[W]e should notice the error only if it is fundamental and highly prejudicial or if the instructions are such that the jury is without adequate guidance on a fundamental question and our failure to consider the error would result in a miscarriage of justice." (internal quotation marks and brackets omitted)).

advisory committee's note (setting forth the plain error standard of review in criminal cases and citing *Johnson v. United States*, 520 U.S. 461, 466–67, 469–70 (1997)).

Yet, the advisory committee's note accompanying the amended Rule 51 also cautions that "the context of civil litigation often differs from the context of criminal prosecution" and instructs that "actual application of the plain-error standard takes account of the differences." *Id.* After setting out the plain error standard under Federal Rule of Criminal Procedure 52, the advisory committee's note highlights four factors to consider in applying plain error review in the civil context: (1) the obviousness of the mistake; (2) the importance of the error; (3) the costs of correcting an error; and (4) "[i]n a case that seems close to the fundamental error line, . . . the impact a verdict may have on nonparties." *Id.* While the first two factors roughly correspond to the plain error standard of review governing criminal cases, the latter two factors are not part of the standard plain error inquiry. *See Puckett v. United States*, 556 U.S. 129, 135 (2009); *Johnson*, 520 U.S. at 466–67; *Olano*, 507 U.S. at 732.

Following the 2003 amendments, several circuits have reaffirmed that plain error review in the civil context is similar to the plain error standard governing criminal cases.[8]

---

[8] *See, e.g.*, *Bauer v. Curators of Univ. of Mo.*, 680 F.3d 1043, 1045 (8th Cir. 2012) (relying on *Olano* for the plain error standard of review under Rule 51); *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 36 (1st Cir. 2006) ("To succeed under the plain error standard, defendants must show that: (1) an error was committed; (2) the error was plain (i.e.[,] obvious and clear under current law); (3) the error was prejudicial (i.e.[,] affected substantial rights); and (4) review is needed to prevent a miscarriage of justice, meaning that the error seriously impaired the fairness, integrity, or

We now join our sister circuits and hold that, when reviewing civil jury instructions for plain error, we must consider, as we do in the criminal context, whether (1) there was an error; (2) the error was obvious; and (3) the error affected substantial rights. *See Johnson*, 520 U.S. at 466–67; *Olano*, 507 U.S. at 732. The text of Federal Rule of Civil Procedure 51(d)(2), which bears a significant resemblance to the text of Federal Rule of Criminal Procedure 52(b), supports this standard. *Compare* Fed. R. Civ. P. 51(d)(2) ("A court may consider a plain error in the instructions that has not been preserved as required by Rule 51(d)(1) if the error affects substantial rights."), *with* Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."). Moreover, the advisory committee's note also weighs in favor of this standard. Fed. R. Civ. P. 51 advisory committee's note; *see Schiavone v. Fortune*, 477 U.S. 21, 31 (1986) (recognizing that the advisory committee's notes on the Federal Rules of Civil Procedure are "of weight" (internal quotation marks omitted)); *United States v. Petri*, 731 F.3d 833, 839 (9th Cir.) (consulting the advisory committee's notes accompanying an amendment to the Federal Rules of Criminal Procedure in interpreting the amendment), *cert. denied*, 134 S. Ct. 681 (2013).

But we also recognize that the stakes are lower in the civil context and, consequently, plain errors should "encompass[] only those errors that reach the pinnacle of fault envisioned by the standard set forth above." *Hemmings*, 285 F.3d at

---

public reputation of judicial proceedings." (internal quotation marks omitted)); *Higbee v. Sentry Ins. Co.*, 440 F.3d 408, 409 (7th Cir. 2006) ("The Advisory Committee notes to the new Rule 51 make clear that we should be guided by the principles of plain error in the criminal context.").

1193 (internal quotation marks omitted).**[9]** Accordingly, when reviewing civil jury instructions for plain error, we find it appropriate to consider the costs of correcting an error, and—in borderline cases—the effect that a verdict may have on nonparties. *See* Fed. R. Civ. P. 51 advisory committee's note; *Schiavone*, 477 U.S. at 31; *Petri*, 731 F.3d at 839.

Finally, we also hold that the decision whether to correct a plain error under Federal Rule of Civil Procedure 51(d)(2) is discretionary. This conclusion flows from the permissive text in Federal Rule of Civil Procedure 51(d)(2). Fed. R. Civ. P. 51(d)(2) ("A court *may* consider a plain error . . . ." (emphasis added)); *see also Conlon v. United States*, 474 F.3d 616, 624–25 (9th Cir. 2007) (explaining that use of the word "may" in Federal Rule of Civil Procedure 36(b) suggests that the district court has discretion in ruling on Rule 36 motions). Moreover, the permissive text of Federal Rule of Civil Procedure 51 parallels Federal Rule of Criminal Procedure 52(b). *See* Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights *may* be considered . . . ." (emphasis added)). It is well-established that a court of appeals has discretion to correct a forfeited error under Federal Rule of Criminal Procedure 52(b), and should do so only if the error "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Olano*, 507 U.S. at 732 (quoting *Young*, 470 U.S. at 15); *see also Johnson*, 520 U.S. at

---

**[9]** We are not alone in recognizing that Rule 51's plain error standard is stricter than its criminal counterpart. *See, e.g.*, *Quigley v. Winter*, 598 F.3d 938, 950 (8th Cir. 2010) ("Plain error is a stringently limited standard of review, especially in the civil context . . . ." (internal quotation marks omitted)); *SEC v. DiBella*, 587 F.3d 553, 569 (2d Cir. 2009) (noting that the standard of review in the civil context "is more stringent than the plain error standard applicable to criminal appeals under Federal Rule of Criminal Procedure 52(b)" (internal quotation marks omitted)).

466–67; *United States v. Alferahin*, 433 F.3d 1148, 1154 (9th Cir. 2006). Furthermore, a number of our sister circuits agree that the decision to correct a plain error under Federal Rule of Civil Procedure 51(d)(2) is discretionary.[10] We therefore conclude that we should exercise our discretion to correct errors under Rule 51(d)(2) only if "review is needed to prevent a miscarriage of justice, meaning that the error seriously impaired the fairness, integrity, or public reputation of judicial proceedings." *Diaz-Fonseca*, 451 F.3d at 36 (internal quotation marks omitted); *see also Olano*, 507 U.S. at 732.

**2.**

With these principles in mind, we turn to the particulars of this case.[11] Defendants argue that the judgment on the

---

[10] *See Jimenez v. Wood Cnty.*, 660 F.3d 841, 845 (5th Cir. 2011) (en banc) (explaining that the court has discretion to correct an unpreserved error if it meets the plain error standard); *Higbee*, 440 F.3d at 409 (recognizing that plain error review is discretionary); *Franklin Prescriptions, Inc. v. N.Y. Times Co.*, 424 F.3d 336, 341 (3d Cir. 2005) ("Plain error review is discretionary—it should be exercised sparingly and should only be invoked with extreme caution in the civil context." (internal quotation marks omitted)).

[11] Defendants contend that plain error review should not govern this case because (1) they lacked the opportunity to object to the district court's extemporaneous instructions, (2) their request that the district court direct the jury to begin re-deliberating with the question regarding false arrest served as adequate notice to the court of the nature of their objection, and (3) C.B. waived any argument that Defendants did not preserve their objections to the jury instructions by failing to raise it before the district court.

We reject these arguments. First, Defendants are correct that C.B. failed to argue, in opposition to Defendants' Motion for a New Trial, that

verdict should be reversed because the supplemental jury instructions were confusing and coerced the jury to reverse its initial verdict. C.B. contends that the district court's supplemental instructions were accurate and that nothing the court said misled or influenced the jury to revise its findings as to the other claims. We conclude that the district court's supplemental jury instructions fall far short of plain error.

Defendants identify four errors in the district court's supplemental instructions. First, they contend that the court confused the jury by referring to the initial verdict as "inconsistent" without explaining what it meant by that term. The record belies this argument. In the course of telling the jury that the verdict contained "an inconsistency," the court explained that "[i]f you don't find . . . privilege, then you can award damages, but you can't award damages if you find that the conduct is privileged."

---

Defendants did not preserve their objections to the district court's supplemental jury instructions. However, we may consider C.B.'s argument nonetheless because it raises a purely legal question and Defendants have offered no reason why C.B.'s failure to raise this argument in his post-trial briefs has prejudiced them. *See Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). Second, Federal Rule of Civil Procedure 51(c)(2) provides that an objection to a jury instruction is timely if a party was not informed of an instruction in advance, and the party objects promptly after the instruction has been given. Defendants therefore could have objected to the supplemental instructions after they were given, but they failed to do so. Finally, Defendants' request that the jury be instructed to begin deliberating with the question on false arrest, falls far short of Rule 51(c)(1)'s requirement that a litigant "stat[e] distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1); *see also Hunter*, 652 F.3d at 1231 (recognizing that "'objections to a charge must be sufficiently specific to bring into focus the precise nature of the alleged error'" (quoting *Palmer v. Hoffman*, 318 U.S. 109, 119 (1943))).

Second, Defendants argue that the district court's response to the jury's request for clarification was confusing and coercive because it fell "far outside the scope of the jury's" question. The jury initially asked whether it should answer yes to Question 8 on the verdict form, the question about privilege, if it found that all of the elements of privilege as set out in Jury Instruction 20, were present. This question could have been answered with a simple "yes." Defendants, however, asked the court to provide a more complete explanation of the relationship between a finding of privilege and an award of damages. At Defendants' own request then, the court responded to the jury's question with an overview of the IIED claim. Moreover, in giving this instruction, the court answered the jury's specific question, stating, "[a]nd so your inquiry here on question number . . . 8, which is the affirmative defense[,] is have the defendants proved the things that are required to be proved on page 23, which is jury instruction 20, the privilege defense." A district court has "wide discretion" in responding to jury questions, *Arizona v. Johnson*, 351 F.3d 988, 994 (9th Cir. 2003), and the explanation here was well within the court's discretion. Although Defendants complain that the court "went on for an additional 8 pages of transcript," the only other statements that the court volunteered were a reminder that the jury also had to answer the question about false arrest and that the jury would be given a corrected verdict form. All other instructions were in response to follow-up questions posed by the jury.

Third, Defendants argue that the supplemental instructions given in response to the follow-up questions were confusing because they told the jury to consider the "totality of the circumstances"—a phrase that appears in the court's instruction on probable cause—in determining whether the

individual officers' conduct was privileged. We find no error in this statement. This instruction did nothing more than admonish the jury to consider all of the facts that bear on the question of privilege. The court's use of the phrase "totality of the circumstances" was tailored to the supplemental instructions and was not a veiled suggestion to revisit the Fourth Amendment claims.

Finally, Defendants argue that the court's instruction that certain findings should be consistent erroneously implied that the jury must return a verdict uniformly in favor of one party. We conclude that the court's instructions did no such thing; the court's comment about "consistency" was clearly tethered to its discussion of the state IIED claim. On the final day of deliberations, the court provided the jury with a brief overview of the "two civil rights claims," but concluded its discussion of those claims by stating:

>  Those are federal claims.

>  Then you have two claims, the third and the fourth claims. One is for intentional infliction of emotional distress and the other is for false arrest. . . .

>  And so as to the two state law claims, the defendants assert what are called affirmative defenses.

After providing this framework for the state law claims, the court directed the jury's attention to the IIED claim, explaining:

And so, in looking at the two state claims, you have the intentional infliction of emotional distress. And then, in jury instruction number 20, you have the defense of privilege and the elements that have to be proved by a preponderance of the evidence.

So when you are considering that defense, you consider the totality of the circumstances. You consider what went in to the claims that you analyzed, the elements of those claims and all the evidence that bears on that. Then you analyze the elements of the defense, all the evidence that bears on that.

And there should be consistency -- and that was your concern -- between those findings. The consistency is a function of how you find the facts, which evidence you believe, how much weight you give to the evidence.

In this context, the court's reference to "consistency" could mean only that the jury's factual findings had to be internally consistent and reconcilable with its ultimate conclusion as to the IIED claim and the privilege defense. The court's statement may not be a model of clarity, but we are confident that no reasonable jury could have understood it as a direction to return a verdict wholly in favor of one party.

In sum, Defendants have not identified any error in the district court's supplemental jury instructions, let alone a plain error.

**B.**

Defendants also challenge several of the district court's evidentiary rulings. We review a district court's evidentiary rulings for abuse of discretion. *Gribben v. United Parcel Serv., Inc.*, 528 F.3d 1166, 1171 (9th Cir. 2008). We will reverse on the basis of an erroneous evidentiary ruling only if the error was prejudicial. *Harper v. City of L.A.*, 533 F.3d 1010, 1030 (9th Cir. 2008); *Tritchler v. Cnty. of Lake*, 358 F.3d 1150, 1155 (9th Cir. 2004). Here, the district court did not abuse its discretion in excluding testimony that Coach Sinclair thought that C.B. might be suicidal and in allowing testimony about past incidents in which police had used handcuffs at Sonora Elementary School.

It is undisputed that Coach Sinclair did not, at any point, tell the officers that she thought C.B. might be suicidal, nor did the officers otherwise learn that information. The district court correctly reasoned that testimony that Coach Sinclair thought C.B. might be suicidal was irrelevant; information that the officers did not know could not justify their decision to seize C.B. *See Moreno v. Baca*, 431 F.3d 633, 640 (9th Cir. 2005) (recognizing that an outstanding arrest warrant for the plaintiff could not be used to justify his arrest where the arresting officers had no knowledge of the warrant). Moreover, the court stated that if Coach Sinclair's motive for calling the police was questioned, she would be able to testify about the incident in which C.B. told her he wanted to run out into traffic. The court, however, concluded that the prejudicial effect of testimony characterizing C.B. as "suicidal" outweighed any probative value such testimony might have. Where "[t]he record reflects that the court conscientiously weighed the probative value against the prejudicial effect for each piece of evidence," we will not

reverse. *Boyd v. City & Cnty. of S.F.*, 576 F.3d 938, 949 (9th Cir. 2009).

The district court also did not abuse its discretion in allowing Coach Sinclair to testify about past incidents of handcuffing at Sonora Elementary School. To prove his Fourth Amendment claim against the City of Sonora, C.B. had to prove that the city maintained an unlawful custom or practice that was a cause of his constitutional injury. *See Fairley v. Luman*, 281 F.3d 913, 916 (9th Cir. 2002) (per curiam) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)). Here, C.B. sought to do just that by introducing testimony from Coach Sinclair that the Sonora Police Department, as a matter of routine procedure, employed handcuffs any time it removed an elementary school child from school grounds. "We have long recognized that a custom or practice can be inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded." *Hunter*, 652 F.3d at 1233 (internal quotation marks omitted)); *see also Menotti v. City of Seattle*, 409 F.3d 1113, 1147–48 (9th Cir. 2005) (holding that testimony from individuals whom officers prohibited from wearing anti-WTO buttons created a genuine issue of material fact as to whether Seattle had an unconstitutional policy of restricting only anti-WTO speech). The district court properly rejected Defendants' contention that Coach Sinclair's testimony about prior incidents of handcuffing at Sonora Elementary School was irrelevant. Nor can Defendants protest that the evidence was unduly prejudicial because it created an inference of an unlawful municipal custom or policy; that was the very

purpose of the evidence. Because the district court's evidentiary rulings were not an abuse of discretion, we will not reverse the judgment on this basis.

## C.

Next we turn to Chief McIntosh's and Officer Prock's qualified immunity arguments. We review de novo a district court's qualified immunity order denying judgment as a matter of law. *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 958–59 (9th Cir. 2000); *see also A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 453 (9th Cir.), *cert. denied*, 134 S. Ct. 531 (2013).[12] In doing so, we "view all evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in favor of the non-mover, and disregard all evidence favorable to the moving party that the jury is not required to believe." *Harper*, 533 F.3d at 1021. To determine whether an individual officer is entitled to qualified immunity, we ask (1) whether the official violated a constitutional right and (2) whether the constitutional right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009); *A.D.*, 712 F.3d at 453–54.

---

[12] C.B. argues that Chief McIntosh and Officer Prock waived their Federal Rule of Civil Procedure 50(b) qualified immunity argument because they failed to make a timely Rule 50(a) motion. Because C.B. failed to raise this argument below, it is waived. *See Graves v. City of Coeur D'Alene*, 339 F.3d 828, 838–39 (9th Cir. 2003) (holding that when a party does not raise its opponent's failure to abide by Rule 50(a) in district court, on appeal, the procedural flaw in the Rule 50(b) motion is waived), *abrogated on other grounds by Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177 (2004).

**1.**[13]

**a.**

C.B. argues that his seizure violated the Fourth Amendment because the officers lacked probable cause to arrest him.  The Fourth Amendment provides:  "The right of the people to be secure in their persons . . . against unreasonable searches and seizures[] shall not be violated . . . ."  As a general principle, "Fourth Amendment seizures are reasonable only if based on probable cause to believe that the individual has committed a crime."  *Bailey v. United States*, 133 S. Ct. 1031, 1037 (2013) (internal quotation marks omitted).  The Supreme Court has recognized a narrow exception to the Fourth Amendment's probable cause requirement "when special needs, beyond the normal need for law enforcement, make the . . . requirement impracticable."  *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995) (internal quotation marks omitted).

In *New Jersey v. T.L.O.*, the Court first recognized that "[t]he school setting . . . requires some modification of the level of suspicion of illicit activity needed to justify a search." 469 U.S. 325, 340 (1985).  Acknowledging that the "privacy interests of school children" must be balanced against the "substantial need of teachers and administrators for freedom to maintain order in the schools," the Court held that, in the school setting, a search by teachers or school officials need only be reasonable under all the circumstances.  *Id.* at 341. It explained the reasonableness inquiry as follows:

---

[13] Part II.C.1, in which Judge Silverman joins, is Judge Paez's dissent from the majority's holding that Chief McIntosh and Officer Prock are entitled to qualified immunity on C.B.'s Fourth Amendment seizure claim.

> Determining the reasonableness of any search involves a twofold inquiry: first, one must consider whether the . . . action was justified at its inception; second, one must determine whether the search as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place. Under ordinary circumstances, a search of a student by a teacher or other school official will be justified at its inception when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

*Id.* at 341–42 (internal quotation marks, citations, and footnotes omitted). We, and several of our sister circuits, have extended *T.L.O.* to seizures of students by school officials. *Doe ex rel. Doe v. Haw. Dep't of Educ.*, 334 F.3d 906, 909 (9th Cir. 2003); *see also Wallace ex rel. Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1012–14 (7th Cir. 1995); *Hassan ex rel. Hassan v. Lubbock Indep. Sch. Dist.*, 55 F.3d 1075, 1079–80 (5th Cir. 1995); *Edwards ex rel. Edwards v. Rees*, 883 F.2d 882, 884 (10th Cir. 1989).

*T.L.O.* is distinguishable from this case in a critical respect: *T.L.O.* involved the conduct of school administrators, not law enforcement officers. 469 U.S. at

328. We have not yet decided whether *T.L.O.*'s reasonableness standard or, instead, traditional Fourth Amendment rules apply to law enforcement searches and seizures in school settings, and there is no need to do so today.[14] At the time of the incident, at least two of our sister circuits had held that *T.L.O.*'s reasonableness standard governs law enforcement conduct concerning school-related incidents in school settings. *See Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1304 (11th Cir. 2006) (applying *T.L.O.* in analyzing an unlawful seizure claim against deputy at an elementary school); *Shade v. City of Farmington*, 309 F.3d 1054, 1060–61 (8th Cir. 2002) (applying *T.L.O.* to evaluate the legality of a search conducted by law enforcement officers in conjunction with school officials). Consequently, at the time of this incident, an officer could have reasonably believed that *T.L.O.* governed law enforcement searches and seizures on school grounds for school-related purposes.

Nonetheless, applying *T.L.O.*'s reasonableness standard does not aid Chief McIntosh and Officer Prock. Taking the facts in the light most favorable to C.B., *see Harper*, 533 F.3d

---

[14] As to law enforcement searches and seizures that pursue law enforcement objectives, we held in *Greene v. Camreta* that the "special needs" doctrine did not apply to seizures on school grounds in which "law enforcement personnel and purposes were . . . deeply involved." 588 F.3d 1011, 1026–27 (9th Cir. 2009). The Supreme Court vacated that holding as moot, but did not disapprove our reasoning. *Camreta v. Greene*, 131 S. Ct. 2020, 2026–27 (2011); *see also Jones v. Hunt*, 410 F.3d 1221, 1228 (10th Cir. 2005) (holding that because a seizure by a deputy sheriff on school grounds "does not involve efforts by school administrators to preserve order on school property, it does not implicate the policy concerns addressed in *T.L.O.* and therefore does not merit application of the *T.L.O.* standard," but declining to specify which Fourth Amendment standard does apply).

at 1021, the officers knew only the following when they decided to handcuff C.B. and remove him from school grounds: (1) the school had reported an "out of control" juvenile; (2) C.B. was a "runner"—whatever that may mean—who had not taken some unknown medication; (3) C.B. sat quietly looking at the ground and never made any movements the whole time police were present; (4) C.B. was unresponsive in the three and a half minutes during which Officer Prock tried to engage with him; and (5) Coach Sinclair wanted C.B. removed from the school grounds.

The officers acted reasonably at the outset by seeking to engage with C.B. to investigate the dispatch that they had received about an "out of control" minor. What they found, though, was a quiet but nonresponsive child. During the entire time police were present, the child did nothing threatening or disobedient. Although Coach Sinclair mentioned that C.B. was a "runner" who had not taken his medication, the officers did not ask a single follow-up question to learn what Coach Sinclair meant and never inquired what had prompted the dispatch. Nor did they consider any less intrusive solutions, such as ordering C.B. to return inside the school building, or asking a guardian to pick up the child.[15] *See T.L.O.*, 469 U.S. at 342 (explaining that a search must not be "excessively intrusive in light of . . . the nature of the infraction"). When viewed in relation to these

---

[15] In fact, C.B.'s uncle testified that Officer Prock reached him on the telephone, and informed him that "the school had called the police department out and [C.B.] could be picked up or needed to be transported to our business." C.B.'s uncle responded, "Well, I would normally pick him up," to which the officer replied, "Well, we've already got him in the car and we'd like to bring him to you. We want to bring him to your place of business." C.B.'s uncle recalled "agree[ing] to that, wanting to comply with the police department."

circumstances, the officers' decision to seize C.B. and remove him from school grounds was not reasonable.

Judge Gould contends that this approach overlooks *T.L.O.*'s instruction that a school official's judgment about the rules necessary to maintain school order is entitled to deference. Gould Concurrence at 64–65. No one seriously questions that principle. Coach Sinclair and other school officials set the rules that govern student behavior, and they may require students to obey their instructions, to take their prescribed medications, to not run away, and so on. The adoption of such rules "presumably reflects a judgment on the part of school officials that such conduct is destructive of school order or of a proper educational environment." *T.L.O.*, 469 U.S. at 343 n.9. "Absent any suggestion that the rule violates some substantive constitutional guarantee," we will defer to the school officials' judgment that the rule furthers school order. *Id.* Coach Sinclair's statement—"[r]unner[,] [n]o medicine"—was so vague, however, that it failed to establish that C.B. was even suspected of violating any school rule.[16]

That detail notwithstanding, at issue here is the reasonableness of the response to a purported violation of a school rule, not the reasonableness of the rule. Judge Gould would defer to Coach Sinclair's determination that C.B.

---

[16] This does not mean that police officers cannot rely on school officials' statements. School officials undoubtedly possess valuable information that would assist police in determining the proper course of action in many cases. But where the school official offers only cursory and ambiguous statements that do not explain what happened and the officers do not observe any behavior that might shed light on what happened, it is unreasonable for the officers to simply presume a safety threat warranting seizure and removal from school grounds.

should be removed from campus. Gould Concurrence at 65–66. But *T.L.O.* does not mandate any deference to a school official's judgment about *the appropriate response* to a rule violation.[17] Instead, *T.L.O.* requires assessing the reasonableness of the school official's search or seizure in response to a rule violation by asking whether it was justified at its inception and whether it was reasonably related in scope to the circumstances that justified the initial intervention. 469 U.S. at 341. There is no question that if Coach Sinclair had removed C.B. from school grounds, our decision would not be based on any deference to her belief that such a seizure was appropriate. If the scope of a school official's search or seizure is not entitled to any deference, then surely, the same search or seizure carried out by a police officer at the behest of that school official must, at minimum, be subject to the same standards; that is, the scope of the ultimate search or seizure must be justified by objective circumstances, not a school official's judgment about the proper course of action. Just because Coach Sinclair wanted C.B. removed from school grounds cannot *ipso facto* make such a seizure reasonable.[18] To suggest otherwise is to eviscerate *T.L.O.*'s

---

[17] Deferring to a school official's judgment that C.B. should be removed from school grounds is not the kind of "'common-sense conclusion' that *T.L.O.* was intended to permit." Gould Concurrence at 66 (quoting *T.L.O.*, 469 U.S. at 346). *T.L.O.* was referring to the reasonable conclusion that a suspected smoker might be stowing cigarettes in her purse. 469 U.S. at 346. No additional facts were necessary to justify searching the purse because common sense suggested that the purse was a natural place to check. The parallel between that scenario and this one is illusive at best.

[18] Judge Gould characterizes Coach Sinclair's request as "facially reasonable." Gould Concurrence at 65. Yet her request was unaccompanied by any meaningful explanation of what C.B. had done to prompt calling the police, and C.B. remained calm and quiet during the entire time police were present. If these circumstances render a request to

requirement that a search or seizure be "reasonably related in scope to the circumstances," *id.*, and effectively to insulate searches and seizures sanctioned by school officials from any review.

Judge Gould also suggests that the need to act quickly prevented the officers from learning more. Gould Concurrence at 65–66. Certainly, in some circumstances, the need to respond swiftly trumps the need to obtain more information. But here, C.B. was calm, surrounded by multiple adults, and, by Chief McIntosh's own characterization, "[n]ot likely" to run away. Nothing about the situation demanded an immediate response. Under these circumstances, the officers could have, and should have, asked some simple follow-up questions that would have enabled them to determine an appropriate response.

Nor does this position require police officers to engage in an "uncabined investigation" before responding to unfolding events, as the majority intimates. M. Smith Opin. at 57. This approach only requires police officers to act reasonably under the circumstances. The standard is a familiar one, *see Terry v. Ohio*, 392 U.S. 1, 21 (1968), and local police officers are quite capable of applying it in the real world.[19] There is nothing remarkable about concluding that, in some circumstances, reasonableness requires asking a follow-up question to assess the circumstances before initiating a seizure.

---

remove a child from school grounds "facially reasonable," what must transpire before a request would be labeled facially unreasonable?

[19] *T.L.O.*'s standard is based on *Terry*'s reasonable suspicion standard. *See T.L.O.*, 469 U.S. at 341.

In sum, taking the evidence in the light most favorable to C.B., a reasonable jury could conclude that Chief McIntosh and Officer Prock violated C.B.'s Fourth Amendment rights when they seized him and took him into custody.

**b.**

We next consider whether it was clearly established on September 28, 2009, that removing C.B. from school grounds was a violation of the Fourth Amendment. "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful," *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (internal quotation marks omitted); indeed, "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope*, 536 U.S. at 741. We should be "particularly mindful of this principle in the context of Fourth Amendment cases, where the constitutional standard— reasonableness—is always a very fact-specific inquiry." *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (en banc). However, where there is no case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011).

At the time of C.B.'s seizure, the law was clearly established that, at a minimum, police seizures at the behest of school officials had to be reasonable in light of the circumstances and not excessively intrusive. *See, e.g.,*

*T.L.O.*, 469 U.S. at 341–42; *Doe*, 334 F.3d at 909; *Gray*, 458 F.3d at 1304; *Jones*, 410 F.3d at 1228; *Shade*, 309 F.3d at 1060–61. Although the application of this constitutional principle may not be clear in certain circumstances, *see Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 378–79 (2009), this "general constitutional rule . . . may [still] apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful,'" *United States v. Lanier*, 520 U.S. 259, 271 (1997) (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

This is such a case. The removal from school grounds of a compliant and calm 11-year-old child—a decision that was made sans any police investigation, without any knowledge of disobedience, and after only minutes on the scene—is an obvious violation of the constitutional principle that the nature of the seizure of a schoolchild must be justified by the circumstances. Even without on-point case law, it is beyond dispute that police officers cannot seize a schoolchild who they do not know to have committed any wrongdoing, who does not appear to pose any threat to himself or others, and who engages in no act of resistance the entire time the officers are present.[20]

---

[20] The Supreme Court's holding in *Safford* that a school official's decision to strip search a middle school child suspected of bringing drugs to school, without any suspicion that the child was hiding the drugs in her underwear, was not an obvious violation of clearly established law, *see* 557 U.S. at 377–79, does not warrant a contrary outcome. In *Safford*, the Court indicated that, in novel circumstances, *T.L.O.*'s general standards will rarely make obvious the boundaries of a constitutional search. *See id.* But this is not a case that turns on the boundaries of a reasonable search or seizure in light of the circumstances. *See Gray*, 458 F.3d at 1305, 1307 (explaining that handcuffing for at least five minutes a 9-year-old who did

Chief McIntosh and Officer Prock do not argue that *T.L.O.* justified seizing C.B. In fact, they argue that they are entitled to qualified immunity only because they reasonably, even if mistakenly, believed they had "reasonable cause"[21] to take C.B. into custody pursuant to California Welfare & Institutions Code sections 601(a) and 625(a). An officer who reasonably but mistakenly believes that his actions are warranted under state law may be entitled to qualified immunity. *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780, 791–93 (9th Cir. 2008); *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994). California Welfare & Institutions Code section 601(a) provides:

> Any person under the age of 18 years who persistently or habitually refuses to obey the reasonable and proper orders or directions of his or her parents, guardian, or custodian, or who is beyond the control of that person . . . is within the jurisdiction of the juvenile court which may adjudge the minor to be a ward of the court.

---

not pose a threat to anyone was "well beyond the hazy border that sometimes separates lawful conduct from unlawful conduct" (internal quotation marks omitted)). Rather, this case involves a scenario where, on the facts known to the officers, there was simply no basis for any kind of seizure. At the very least, *T.L.O.* makes obvious that there must be *some* basis for a search or seizure of any scope.

[21] Defendants expend a great deal of energy arguing about the difference between "reasonable cause" as used in the California Welfare & Institutions Code and the traditional concept of "probable cause." If there is a difference between the standards, this case does not turn on it.

Section 625(a) provides that "[a] peace officer may, without a warrant, take into temporary custody a minor . . . [w]ho is under the age of 18 years when such officer has reasonable cause for believing that such minor is a person described in Section 601."

Chief McIntosh and Officer Prock contend that they reasonably thought that C.B. was "beyond the control" of the relevant school officials, who they understood to be the custodians of C.B. during school hours. However, taking the facts in the light most favorable to the nonmoving party, no reasonable officer could have thought that C.B. was "beyond the control" of anyone. California case law makes clear that "*by itself*, a single act in violation of parental authority is ordinarily insufficient to establish that the minor is beyond parental control." *McIsaac v. Bettye K. (In re Bettye K.)*, 285 Cal. Rptr. 633, 636 (Ct. App. 1991). In *In re Henry G.*, the California Court of Appeal found insufficient evidence that Henry G. was beyond the control of his mother where he did not tell her where he was going, stayed out until 3 a.m., and struck her when she attempted to physically stop him from leaving the house. *Kirkpatrick v. Henry G. (In re Henry G.)*, 104 Cal. Rptr. 585, 587, 589–90 (Ct. App. 1972). Similarly, in *In re D.J.B.*, the court explained that a single act may show that a minor is beyond control only when it is sufficiently serious, and the court held that a single instance of leaving home without parental consent did not rise to such a level. *Bayes v. D.J.B. (In re D.J.B.)*, 96 Cal. Rptr. 146, 149 (Ct. App. 1971). Cases in which a single instance of defiance was sufficient to find that a minor was beyond the control of a parent involved an extraordinarily serious act of defiance. *See Bayes v. David S. (In re David S.)*, 91 Cal. Rptr. 261, 263 (Ct. App. 1970) (holding that a minor who had told his mother he would be spending the weekend with friends about

40 miles from home but who was actually found about 600 miles away from home attempting to cross the border into Mexico was beyond the control of his parents); *see also In re Bettye K.*, 285 Cal. Rptr. at 636–37.

Here, when viewed in the light most favorable to C.B., the officers did not know of even a single instance of disobedience, much less one serious enough to trigger sections 601(a) and 625(a). C.B. did not take his medicine, but the officers had no basis to conclude that he had refused to do so and did not know what kind of medication it was. C.B. was purportedly a "runner," but the officers had no information that he had actually attempted to run from anyone that day. During the brief period before the officers decided to handcuff him, C.B. did not disobey any of their orders. And, as soon as they initiated the process of handcuffing and removing him from the school grounds, C.B. complied with all of their instructions. In sum, the officers knew of no defiant act by C.B.; any belief that C.B. was beyond the school's control was not reasonable because it lacked any basis in fact. Moreover, even assuming it was reasonable to believe that C.B. had earlier defied a school official by refusing medicine and running, it was apparent that C.B. had not run off school grounds and was, instead, sitting calmly in the school playground. Such a singular instance of disobedience does not even come close to satisfying the statutory requirement that the minor be "beyond the control" of his custodian. *See In re Bettye K.*, 285 Cal. Rptr. at 636–37; *In re Henry G.*, 104 Cal. Rptr. at 587, 589–90; *In re D.J.B.*, 96 Cal. Rptr. at 149; *In re David S.*, 91 Cal. Rptr. at 263. An officer who enforces a state statute "in a manner which a reasonable officer would recognize exceeds the bounds of the [statute] will not be entitled to immunity even if there is no clear case law

declaring the [statute] or the officer's particular conduct unconstitutional." *Grossman*, 33 F.3d at 1210.[22]

Chief McIntosh and Officer Prock argue that their belief that sections 601(a) and 625(a) applied in this instance was reasonable because Coach Sinclair allegedly told Chief McIntosh that C.B. was "out of control," "would run off campus," and was "yelling and cussing."[23]  Whatever the merits of the argument that a reasonable officer might have believed that sections 601(a) and 625(a) justified taking a child into custody in light of these additional facts, that is not the scenario presented here.  Neither Coach Sinclair nor C.B.—the other witnesses present during this purported exchange—recalls Coach Sinclair making these statements.  Although it is possible that C.B.'s and Coach Sinclair's recollections are incomplete, when taking the facts in the light most favorable to C.B., *see Harper*, 533 F.3d at 1021, it must be assumed that it is Chief McIntosh's account that is inaccurate.[24]

Based on the foregoing, Chief McIntosh and Officer Prock are not, in my view, entitled to qualified immunity with respect to C.B.'s unlawful seizure claim.

---

[22] Because C.B.'s conduct could not possibly satisfy the "beyond the control" prong of the statute, there is no need to consider whether the term "custodian" as used in section 601(a) includes school authorities.

[23] Notably, neither the officers nor Coach Sinclair ever testified that Coach Sinclair told Chief McIntosh that C.B. would "run off campus."

[24] Accordingly, there is no need to decide whether, under the version of events most favorable to the officers, Chief McIntosh and Officer Prock were justified in seizing C.B. pursuant to sections 601(a) and 625(a), although that is a dubious proposition.

**2.**

**a.**

C.B. also argues that the officers used excessive force in violation of the Fourth Amendment when, upon removing him from school grounds, they handcuffed C.B. for twenty-five to thirty minutes. The Fourth Amendment guarantees the right to be free from an arrest effectuated through excessive force. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989); *Wall v. Cnty. of Orange*, 364 F.3d 1107, 1112 (9th Cir. 2004). C.B. argues that the officers' conduct was unreasonable under the test set out in *Graham*. Under *Graham*, whether the amount of force employed was excessive depends on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to he safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396.

We have previously applied *T.L.O.*'s reasonableness standard to evaluate whether a school official was entitled to qualified immunity from an excessive force claim. *See Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1179–81 (9th Cir. 2007). Additionally, at the time of the incident, at least two of our sister circuits had held that *T.L.O.*'s reasonableness standard governs law enforcement searches and seizures concerning school-related incidents in school settings. *See Gray*, 458 F.3d at 1304; *Shade*, 309 F.3d at 1060–61. We have not yet considered whether *Graham* or *T.L.O.* applies to law enforcement officers' use of force against a student in a school setting, and we do not resolve that question today. But we believe that *Preschooler II*, *Gray*, and *Shade* could have led a reasonable officer to

conclude that *T.L.O.* governs police use of force in response to school-related incidents as well. In no event, however, do we think that an officer could have reasonably believed that *T.L.O.* governs police use of force once a student is in police custody and outside the confines of the school setting, as C.B. was throughout the commute to his uncle's place of business.

Ultimately, in our view, whether *T.L.O.* or *Graham* governed Chief McIntosh's and Officer Prock's actions at any given moment is of little consequence. Chief McIntosh's and Officer Prock's use of handcuffs on a calm, compliant, but nonresponsive 11-year-old child was unreasonable under either standard. Other than an assertion that they were told C.B. might run away, Chief McIntosh and Officer Prock offer no justification for their decision to use handcuffs on C.B. During the entire incident, C.B. never did anything that suggested he might run away or that he otherwise posed a safety threat. He weighed about 80 pounds and was approximately 4'8'' tall—by no means a large child. Moreover, he was surrounded by four or five adults at all times. The police department's own policy manual cautions against using handcuffs on children under the age of 14 unless the child has committed "a dangerous felony or when they are of a state of mind which suggests a reasonable probability of their desire to escape, injure themselves, the officer, or to destroy property." Even Chief McIntosh admitted that it was "[n]ot likely" that C.B. could run away. In these circumstances, we conclude that the decision to use handcuffs on C.B. was unreasonable, notwithstanding Coach Sinclair's unexplained statement that C.B. was a "runner." The further decision to leave C.B. in handcuffs for the duration of the half-hour commute to his uncle's business—a commute that took place in a vehicle equipped with safety

locks that made escape impossible—was clearly unreasonable.

Judge Smith counters that the use of handcuffs was justified because C.B. might have attempted to run at various points during their interaction, risking serious harm to himself. M. Smith Opin. at 59–60. But there is no evidence that C.B. was likely to run; even Chief McIntosh himself thought it unlikely that C.B. would be able to flee. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (per curiam) (overturning grant of qualified immunity because the lower court did not view the evidence in favor of the nonmoving party). "Anything is possible" is not a sufficient basis to handcuff a child who poses no likely threat of any kind.

**b.**

At the time of the incident, the law was also clearly established that, at a minimum, police use of force in response to school-related incidents had to be reasonable in light of the circumstances and not excessively intrusive. *See T.L.O.*, 469 U.S. at 341–42; *Preschooler II*, 479 F.3d at 1179–81. And the law was clearly established that, as a general matter, police use of force must be carefully calibrated to respond to the particulars of a case, including the wrongdoing at issue, the safety threat posed by the suspect, and the risk of flight. *See Graham*, 490 U.S. at 396. Although these general standards "cannot always, alone, provide fair notice to every reasonable law enforcement officer that his or her conduct is unconstitutional," *Mattos*, 661 F.3d at 442, "in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam).

Applying handcuffs to C.B., and keeping him handcuffed for the approximately thirty minutes it took to drive to his uncle's business, was an obvious violation of these standards. It is beyond dispute that handcuffing a small, calm child who is surrounded by numerous adults, who complies with all of the officers' instructions, and who is, by an officer's own account, unlikely to flee, was completely unnecessary and excessively intrusive. Moreover, none of the *Graham* factors even remotely justified keeping C.B. handcuffed for approximately thirty minutes in the back seat of a safety-locked vehicle.

Chief McIntosh and Officer Prock argue that because they were reasonable in taking C.B. into custody pursuant to the California Welfare & Institutions Code sections 601(a) and 625(a), their use of handcuffs was also reasonable because California Penal Code section 835 provides that an individual under arrest "may be subjected to such restraint as is reasonable for his arrest and detention." Even if California law permitted the level of force used here—which it does not—that would have no bearing on whether the officers violated clearly established federal law. *See Ramirez v. City of Buena Park*, 560 F.3d 1012, 1024–25 (9th Cir. 2009). California Penal Code section 835 cannot shield the officers from liability for a clear constitutional violation.

In sum, we hold that Chief McIntosh and Officer Prock are not entitled to qualified immunity for handcuffing C.B.

## D.

Finally, we turn to Defendants' argument that they are entitled to an offset against damages because of C.B.'s settlement with the Sonora School District. Defendants argue

that they are entitled to an offset under California Code of Civil Procedure section 877.[25]  Section 877 provides that, when a plaintiff enters into a settlement with one or more joint tortfeasors, "it shall reduce the claims against the other[] [tortfeasors] in the amount stipulated by the [settlement]." "Whether individuals are joint tortfeasors under [section] 877 depends upon whether they caused 'one indivisible injury' or 'the same wrong.'"  *Decker v. Tramiel (In re JTS Corp.)*, 617 F.3d 1102, 1116 (9th Cir. 2010) (quoting *May v. Miller*, 278 Cal. Rptr. 341, 344 (Ct. App. 1991); *see also Lafayette v. Cnty. of L.A.*, 208 Cal. Rptr. 668, 672 (Ct. App. 1984)).  C.B. contends that Defendants are not entitled to an offset because the Sonora School District caused a distinct injury.  We need not resolve this issue because Defendants have not met their burden to show that they are entitled to an offset for another reason.

California Civil Code section 1431.2(a) provides that liability for economic damages is joint and several, but liability for noneconomic damages is apportioned according

---

[25] It is not clear that California law, as opposed to federal law, governs Defendants' settlement offset claim in a case such as this one, which involves both federal and state law claims. *See Corder v. Brown*, 25 F.3d 833, 839–40 (9th Cir. 1994) (recognizing that courts are split as to whether state law or federal common law determines a defendant's entitlement to an offset in suits involving federal claims but declining to resolve the split because the text of the particular federal statute at issue permitted an offset).  Defendants argue only that they are entitled to an offset under California Code of Civil Procedure section 877.  As we explain in text, even if section 877 applied here, Defendants would not be entitled to an offset.  Accordingly, we need not decide whether state or federal law applies.

to the principles of comparative fault.[26]   California courts
have interpreted California Civil Code section 1431.2 as
limiting California Code of Civil Procedure section 877 to
economic damages only.  *See Greathouse v. Amcord, Inc.*,
41 Cal. Rptr. 2d 561, 564 (Ct. App. 1995) ("It is now well
established that Code of Civil Procedure section 877 allows
[the defendants] to set off settlement payments only for
economic damages against the jury's verdict.  Settlement
payments attributable to non-economic damages are not
subject to the setoff."); *Espinoza v. Machonga*, 11 Cal. Rptr.
2d 498, 502 (Ct. App. 1992) (explaining that there can be no
offset for noneconomic damages because a "plaintiff's valid
'claim' against one . . . tortfeasor for non-economic damages
can never be the liability of 'the others'" (quoting Cal. Civ.
Code § 1431.2)).   Consequently, in calculating offsets,
California courts look to the percentage of the jury's award
that is attributable to noneconomic damages and reduce the
award by that same proportion of the settlement.  *See Conrad*

---

[26] California Civil Code section 1431.2(b) defines economic and
noneconomic damages as follows:

> (1) For purposes of this section, the term
> "economic damages" means objectively verifiable
> monetary losses including medical expenses, loss of
> earnings, burial costs, loss of use of property, costs of
> repair or replacement, costs of obtaining substitute
> domestic services, loss of employment and loss of
> business or employment opportunities.

> (2) For the purposes of this section, the term
> "non-economic damages" means subjective,
> non-monetary losses including, but not limited to, pain,
> suffering, inconvenience, mental suffering, emotional
> distress, loss of society and companionship, loss of
> consortium, injury to reputation and humiliation.

*v. Ball Corp.*, 29 Cal. Rptr. 2d 441, 443 (Ct. App. 1994); *Espinoza*, 11 Cal. Rptr. 2d at 504. But, where "the special verdict [does] not specify economic and noneconomic damages, but merely award[s] an undifferentiated lump sum," and the defendant failed to propose such a special verdict, the defendant is deemed to have waived any right to any offset. *Conrad*, 29 Cal. Rptr. 2d at 443–44. This is because "[a] defendant seeking an offset against a money judgment has the burden of proving the offset." *Id.* at 444.

Here, Defendants initially did propose a jury instruction that distinguished between economic and noneconomic damages. However, when the court provided its proposed jury instructions and verdict form, Defendants did not object to the exclusion of their proposed allocation. The court specifically asked Defendants if they had any objections to either the proposed jury instructions or the verdict form, and Defendants objected to unrelated portions of the jury instructions, but not the omission of their proposed question about damages on the verdict form. By failing to object to an undifferentiated verdict form, Defendants have not met their burden to show what portion of the jury's award was for economic damages. *See Conrad*, 29 Cal. Rptr. 2d at 443–44; *cf. Grosvenor Props. Ltd. v. Southmark Corp.*, 896 F.2d 1149, 1152–53 (9th Cir. 1990) (recognizing that mere submission of an alternative proposed instruction is insufficient to preserve for appeal an objection to the instruction given). Consequently, the district court did not err in refusing to award Defendants a $20,000 offset against the jury's damages award.

### III. Conclusion

We conclude that Defendants have not identified any plain error in the district court's jury instructions, the district court's evidentiary rulings were not an abuse of discretion, and Defendants have not shown they are entitled to a settlement offset. Furthermore, we hold that Chief McIntosh and Officer Prock are not entitled to qualified immunity because no officer could have reasonably believed that their use of handcuffs to remove C.B. from school grounds complied with the Fourth Amendment. However, as set forth in Judge M. Smith's majority opinion, the district court's ruling on Chief McIntosh's and Officer Prock's motion for judgment as a matter of law denying them qualified immunity on C.B.'s Fourth Amendment unlawful seizure claim is reversed.

The judgment of the district court is affirmed in part, reversed in part. The judgment against Chief Mace McIntosh is reduced by $15,000. The judgment against Officer Hal Prock is reduced by $5,000.

### AFFIRMED IN PART AND REVERSED IN PART.

C.B. shall recover his costs on appeal against the City of Sonora; no costs are awarded against Chief McIntosh and Officer Prock.

M. SMITH, Circuit Judge, concurring in part, and dissenting in part, with whom O'SCANNLAIN, TALLMAN, and BYBEE, Circuit Judges, join in full, and with whom KOZINSKI, Chief Judge, and GRABER and GOULD, Circuit Judges, join as to Part I, which is the opinion of the court:

A majority of the en banc court agrees that Chief McIntosh and Officer Prock (the officers) are entitled to qualified immunity with respect to C.B.'s unlawful seizure claim. A reasonable officer would not have known that taking a child in C.B.'s situation into temporary custody was unreasonable, and therefore unconstitutional. However, I respectfully dissent from the majority's conclusion denying the officers qualified immunity with respect to C.B.'s excessive force claim. In my view, the officers are entitled to qualified immunity on both of C.B.'s Fourth Amendment claims because the constitutional rights at issue in this case were neither clearly established nor "obvious" at the time C.B. was taken into temporary custody.

To determine whether an officer is entitled to qualified immunity, we consider (1) whether he violated a constitutional right and (2) whether the constitutional right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009). "[C]ourts should define the 'clearly established' right at issue on the basis of the 'specific context of the case.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Our court, however, has been singled out and chastised by the Supreme Court for our propensity to improperly find "clearly established" rights. Specifically, the Court has mandated that "courts—*and the Ninth Circuit in particular*—not . . . define clearly established law at a high

level of generality." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011) (emphasis added) (internal citation omitted).

Despite the Court's clear instruction that we not "define clearly established law at a high level of generality," the majority's hurried discussion of the second prong of the qualified immunity analysis does just that. Specifically, the majority defines the relevant law as requiring the use of force to be "carefully calibrated to respond to the particulars of a case . . . ."[1] But this very general statement clearly does not provide "fair warning" to a reasonable officer that handcuffing C.B. to take him into temporary custody violates his Fourth Amendment rights. *See Tolan*, 134 S. Ct. at 1866; *Brosseau v. Haugen*, 543 U.S. 194, 198–99 (2004) (per curiam).

I respectfully disagree with the majority's characterization of these facts as an "obvious violation" of C.B.'s constitutional rights, and with its conclusion that this case is not therefore subject to the Court's admonitions against defining "clearly established law" in overly general terms. I acknowledge that the Court has recognized that general standards can create a "clearly establish[ed]" right in an "obvious case," even "without a body of relevant case law." *See Brosseau*, 543 U.S. at 199. But the facts of this case, even when viewed in the light most favorable to C.B., *see Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008), do not come close to constituting an "obvious"

---

[1] The Supreme Court has explained that "[t]he general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *al-Kidd*, 131 S. Ct. at 2084.

violation of a "clearly establish[ed]" right. *See Brosseau*, 543 U.S. at 199.

## I.   Unlawful Seizure Claim

Assuming *New Jersey v. T.L.O.*'s reasonableness standard applies, as my colleagues do, C.B. cannot show that a reasonable officer would have understood that taking him into temporary custody was unreasonable, and therefore unconstitutional. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985).

When analyzing whether an individual's Fourth Amendment rights were violated, we must determine whether the seizure was reasonable under "all the circumstances." *T.L.O.*, 469 U.S. at 341. Qualified immunity insulates the officers from liability unless "existing precedent . . . ha[s] placed the statutory or constitutional question beyond debate." *al-Kidd*, 131 S. Ct. at 2083.

Viewed in its entirety, the record reveals that the situation confronting the officers did not present an "obvious" violation of C.B.'s constitutional rights. The circumstances facing the officers when they decided to take C.B. into temporary custody are as follows. First, officers knew that school officials had reported that C.B. was a "runner" and "out of control." Second, although Judge Paez describes C.B. as "compliant," C.B. himself admitted that he completely ignored Officer Prock's questions for three and a half minutes. Third, the officers did not know exactly which medication C.B. had failed to take. But a reasonable officer would have evaluated Coach Sinclair's statements in context, and would likely have believed that Coach Sinclair stated that C.B. did not take his medication because it was related to his

behavior—the very reason why the officers were called to the school in the first place.

A reasonable officer in this situation, faced with a juvenile who (a) was reportedly a "runner," (b) was "out of control," (c) ignored the officer's questions, and (d) had not taken his medication, would not have known that taking such a juvenile into temporary custody in order to transport him safely to his uncle was an "obvious" violation of his constitutional rights.

Judge Paez attempts to characterize this situation as an "obvious" violation of C.B.'s constitutional rights by emphasizing that C.B. was a "compliant and calm 11-year-old child," and that the officers had "[no] knowledge of disobedience." However, C.B. had resisted the officers by ignoring their questions and was reported by the school as out of control, regardless of how he appeared at the exact moment when the officers took him into temporary custody. And although a reasonable officer would have observed that C.B. was young, age alone does not impose a complete bar on taking an individual into temporary custody, or on believing a school official's report.

Judge Paez also notes that the decision to take C.B. into temporary custody was made "sans any police investigation." Respectfully, this characterization fails to address several important points. The facts show that the officers *did* investigate by obtaining information from Coach Sinclair and attempting to question C.B., who refused to respond. Additionally, taking C.B. into custody without any *further* investigation was not an obvious violation of his constitutional rights because clearly established law at the time of the seizure did not mandate any additional

investigation, nor did it preclude reasonable reliance on the statements of school officials. *See T.L.O.*, 469 U.S. at 346.

If we were to hold that the officers' conduct was an "obvious violation," we would effectively establish a new rule that police officers in a situation similar to this one must undertake an independent investigation whenever they observe behavior that appears in any way inconsistent with a school official's report. Such a requirement would be unworkable in the real world of law enforcement and school administration. Does an officer who is told by a school official that a student is a runner and has not taken his medications, but who later encounters the student seated and quiet, need to undertake an investigation because the student is not running or "out of control" at that time? What would that investigation entail? Would it require reviewing the student's record with school officials to determine what being a "runner" means in that particular student's situation? Would it involve talking with school counselors, teachers, or physicians who have dealt with the student to better understand the severity of the student's problems? By characterizing the officers' conduct as an "obvious violation" of constitutional rights, the dissent would require an officer to undertake such an uncabined investigation prior to responding to these situations, or risk personal financial liability if he did not. It would disincentivize officers from responding to calls for help from school officials under similar circumstances.

But the officers' conduct was not an "obvious violation" of C.B.'s constitutional rights. Under "all the circumstances," *T.L.O.*, 469 U.S. at 341, a reasonable officer would not have understood that taking C.B. into temporary custody violated his rights. The Supreme Court has been pellucidly clear that

the purpose of qualified immunity is to give officers "breathing room" in uncertain situations. *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (per curiam) (quoting *al-Kidd*, 131 S. Ct. at 2085). Accordingly, the officers are entitled to qualified immunity on the unlawful seizure claim.[2]

## II. Excessive Force Claim

I respectfully disagree with the majority's conclusion that the scope of C.B.'s right to be free from excessive force was

---

[2] Judge Berzon states that our case law requires police officers to have some cause to take children into custody. She cites language from *Crowe v. County of San Diego*, that a police officer was not entitled to qualified immunity when he "failed to provide any justification" for a seizure. 608 F.3d 406, 439 (9th Cir. 2010). At issue there was the detention at a police station of the *parents* of a murder victim. *Id.* Additionally, it was the district court that had denied summary judgment due to the officer's failure to provide any justification. We affirmed, but on the ground that the parents did not consent to the detention because the officer had pointed a gun at them.

In *Henderson v. Mohave County*, also cited by Judge Berzon, we denied qualified immunity to officers who seized a child after ignoring her mother's court order showing that she had custody. 54 F.3d 592, 595 (9th Cir. 1995).

Relying on these cases, Judge Berzon concludes that no reasonable officer would have believed that there was cause to take C.B. into custody under section 601 of the Welfare and Institutions Code. Even assuming *Crowe* applies here, it does not require that a state law provide justification for the seizure. Rather, under the Fourth Amendment, the seizure need only be reasonable under all the circumstances. *See T.L.O.*, 469 U.S. at 341. Unlike in *Henderson*, where the officers had no justification for their actions, here, a reasonable officer would have believed he was justified in taking C.B. into temporary custody based on the information available to him, including the school's report that he was out of control and had not taken his medication.

clearly established. The majority gives inadequate weight to the Court's directive that "clearly established law" not be defined at a high level of generality, *see al-Kidd*, 131 S. Ct. at 2084, for it was far from "obvious" that handcuffing C.B.—a known "runner" reported to be "out of control"—constituted excessive force. Rather, assuming without deciding that *Graham v. Connor*, 490 U.S. 386, 396 (1989), controls in this situation, handcuffing C.B. was clearly reasonable when balanced against the need to ensure C.B.'s safety by preventing him from fleeing or injuring himself.

The "reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396 (internal quotation marks omitted). The force used by officers must be objectively reasonable under the circumstances, and need not be the least intrusive means available to them. *Id.* at 397, 399; *Luchtel v. Hagemann*, 623 F.3d 975, 982 (9th Cir. 2010). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397–98. In determining whether force, including the use of handcuffs, is reasonable, we consider, among other things, whether the individual poses an immediate threat to the safety of the officers or others, and whether he is attempting to evade arrest by flight. *See id.* at 396.

There is no clearly established law indicating that handcuffing C.B. to transport him safely from school grounds to his uncle's business was not objectively reasonable under

the circumstances. *See id.* at 399. The majority characterizes C.B. as a "small, calm child." But when the officers encountered C.B., the school had reported that C.B. was "out of control," and Coach Sinclair had stated that he was a "runner." Particularly in light of C.B.'s refusal to answer the officers' questions, a reasonable officer would have taken the school officials' concerns seriously. The fact that C.B. was sitting at the time the officers encountered him does not contradict Coach Sinclair's statement that he was a runner. A reasonable officer would not have known that encountering C.B. sitting down and not responding to questions would necessitate a detailed investigation into the veracity and meaning of Coach Sinclair's statement before using handcuffs, especially in light of the fact that the reasonableness inquiry allows officers to make split-second judgments in uncertain situations. *See id.* at 397–98.

Finally, although the majority characterizes C.B.'s unresponsiveness to Officer Prock's questioning as mere silent obedience, a reasonable officer could have viewed C.B.'s refusal to answer the questions as an act of defiance.[3] Indeed, officers are trained that such unresponsive behavior may be a "cue[] to escalation," indicating that the individual may be looking for an opportunity to flee. Because a busy roadway abuts C.B.'s schoolyard, the consequences of ignoring Coach Sinclair's warning and C.B.'s unresponsive behavior, and spending time conducting an investigation, could have been serious, or even fatal.

In this situation, a reasonable officer, relying on the statement of Coach Sinclair that C.B. is a "runner," *see*

---

[3] C.B. admitted that he completely ignored Officer Prock's questions for three and a half minutes.

*T.L.O.*, 469 U.S. at 346, could have determined that C.B. would pose a danger to himself if he ran into the roadway, and that he would be at risk of injury if he had to be apprehended while running.  A reasonable officer, relying on precedent establishing that handcuffs may be appropriate to prevent flight, *see id.*; *Meredith v. Erath*, 342 F.3d 1057, 1063 (9th Cir. 2003), would not have known that it was a constitutional violation to place C.B. in handcuffs to ensure his safety.[4]

Additionally, it was not clearly established that keeping a juvenile in C.B.'s situation handcuffed for approximately thirty minutes while the officers transported him to his uncle was unconstitutional.  A reasonable officer could have believed that it was permissible to keep C.B. handcuffed to ensure his safety in light of the fact that C.B. could have hurt himself in the car, or attempted to flee while the officer was removing the handcuffs before placing C.B. in the car. Moreover, handcuffing C.B. to prevent flight comports with standard police procedure.  Although the City of Sonora's policy recommends that handcuffs generally should not be used for a juvenile under the age of 14, it also provides that officers may in their discretion handcuff a juvenile if he is of the state of mind that suggests a reasonable probability of his

---

[4] Judge Paez notes that Chief McIntosh believed that it was not likely that C.B. could run away from the officers.  However, Chief McIntosh's subjective beliefs are not relevant as "[t]he Fourth Amendment inquiry is one of objective reasonableness under the circumstances, and subjective concepts . . . have no proper place in that inquiry." *Graham*, 490 U.S. at 399 (internal quotation marks omitted).  Moreover, even if C.B. could not have succeeded in running away, a reasonable officer could have believed it was likely that C.B. would have tried to run away, given his history as a runner.  In such a case, the officer would have needed to apprehend C.B., which would have posed a risk of injury.

desire to escape or that he may injure himself. This policy is fully consistent with Supreme Court precedent. *See Graham*, 490 U.S. at 396.

Although handcuffing a juvenile is not a matter to be taken lightly, neither is the juvenile's safety. Under the majority's reasoning, officers' legitimate concerns for a child's safety are no longer sufficient to justify handcuffing, and officers are now potentially liable for monetary damages if they use handcuffs out of concern for a child's safety. But had an officer in this situation not handcuffed C.B., and had C.B. run into the roadway and been killed or injured by a passing vehicle, the officer, knowing that C.B. was a runner, would surely have been liable due to his failure to ensure C.B.'s safety. Under the majority's new rule, officers are now damned if they do, and damned if they don't, when dealing with schoolchildren who are known runners.

Because this case is not an "obvious" one where general standards clearly establish C.B.'s rights, a reasonable officer would not have known that handcuffing C.B. to safely take him into temporary custody violated his constitutional rights.

The Supreme Court has taught that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 131 S. Ct. at 2085 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).[5] Here,

---

[5] The Supreme Court's recent case law illustrates the substantial protection that qualified immunity affords police officers. Although each case is decided based on its specific facts, the reality is that the Supreme Court in the recent past has rarely denied qualified immunity to police officers. As one scholar has observed, before the recent reversal of a grant of qualified immunity in *Tolan*, 134 S. Ct. 1861, the Court had not ruled against a police officer in a qualified immunity case since *Groh v.*

because there is no indication that the officers knowingly violated the law, the majority, in denying qualified immunity, must view the officers as "plainly incompetent." I find no evidence that either officer is "plainly incompetent." Because C.B.'s constitutional rights were not clearly established, the district court improperly denied qualified immunity to the officers. I therefore respectfully dissent from the majority's contrary conclusion denying qualified immunity to the officers with respect to C.B.'s excessive force claim.

---

GOULD, Circuit Judge, with whom KOZINSKI, Chief Judge, and GRABER, Circuit Judge, join, concurring in part in Judge Paez's opinion and concurring in part in Judge M. Smith's opinion:

I join Parts I, II.A, II.B, II.C.2, and II.D of Judge Paez's opinion, concerning the factual background, rejection of the challenges to jury instructions and to evidentiary rulings, and the conclusions that Chief McIntosh and Officer Prock used excessive force in violation of the Fourth Amendment when, in removing C.B. from school grounds, they handcuffed him for 25 to 30 minutes and that they are not entitled to qualified immunity for handcuffing C.B.

---

*Ramirez*, 540 U.S. 551 (2004), decided nearly a decade earlier. *See* Will Baude, Tolan v. Cotton — *when should the Supreme Court interfere in 'factbound' cases?*, The Washington Post, The Volokh Conspiracy (May 7, 2014, 9:40 AM), http://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/05/07/tolan-v-cotton-when-should-the-supreme-court-interfere-in-factbound-cases/?tid=pm_national_pop (last visited September 22, 2014).

I join in Part I of Judge M. Smith's opinion, concerning the unlawful seizure claim, concluding that the officers are entitled to qualified immunity as to the seizure of C.B.

On the issue of unlawful seizure: *T.L.O.*'s reasonableness standard requires that a search be "justified at its inception" and, "as actually conducted," be "reasonably related in scope to the circumstances which justified the interference in the first place." *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985) (internal quotation marks omitted). We should give weight to the parts of the Court's opinion in *T.L.O.* that gave its reasons for holding that "the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject." *Id.* at 340.

The Court's primary concern in *T.L.O.* was balancing the "privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools." *Id.* at 341. The need for order in the school setting permits searches when reasonable grounds exist to suspect violations not just of law, but of "the rules of the school." *Id.* at 342. When a court examines the rules of a school, it "should, as a general matter, defer" to the school's judgment that the rule is necessary to prevent "conduct [that] is destructive of school order or of a proper educational environment." *Id.* at 343 n.9. In applying this standard to the facts of T.L.O.'s case, the Court approved of a school administrator's use of "the sort of common-sense conclusio[ns] about human behavior upon which practical people—including government officials—are entitled to rely." *Id.* at 346 (internal quotation marks omitted).

In concurrence, Justices Powell and O'Connor stressed the "special characteristics" of the school environment,

noting that "teachers have a degree of familiarity with, and authority over, their students that is unparalleled except perhaps in the relationship between parent and child." *Id.* at 348. Based on this relationship, the concurring Justices concluded that "[t]he primary duty of school officials and teachers . . . is the education and training of young people. A State has a compelling interest in assuring that the schools meet this responsibility. Without first establishing discipline and maintaining order, teachers cannot begin to educate their students." *Id.* at 350 (Powell and O'Connor, JJ., concurring).

Reasonable officers could have believed that the Constitution allows them to remove a student from school grounds based on a facially reasonable request from school officials. This conclusion is reinforced by the facts. Coach Sinclair, the requesting official, was the school's official disciplinarian, the person most responsible for maintaining order at Sonora Elementary. Coach Sinclair's request was supported by contentions that C.B. was a runner and had not taken his medicine. The allegations supported the notion that C.B. was violating the rules of the school or impairing discipline and maintenance of order, prerequisites to educating students. *See id.* Finally, the police officers were on campus for less than five minutes before taking C.B. into custody. This brief visit to the school environment could not safely give them such information as would be necessary to overrule the considered judgment of a school official, particularly given the close relationship between teachers and students. *See id.* at 348.

In the modern world, delay in the school setting can pose grave dangers to many, an unfortunate fact that may at times require police to act promptly upon arrival. In the context of dangers presented to students at schools, rather than require

officers to make an independent investigation when they arrive at a school, a reasonable police officer could believe that the Constitution would allow him or her to rely on responsible school officials.  Here, the officers could reasonably have believed that relying on Coach Sinclair over what they personally saw in their brief and isolated visit was the kind of "common-sense conclusion" that *T.L.O.* was intended to permit.  *Id.* at 346 (majority opinion).  When a school official makes a determination that it is necessary to remove a student from campus to maintain order, protect that student or others, or otherwise to prevent the destruction of the "proper educational environment," *id.* at 343 n.9, in my view a reasonable officer could have believed that he or she was entitled to rely on that judgment.

On the issue of excessive force by handcuffing: Police officers may reasonably believe that the Fourth Amendment permits them to give deference to a school official's request that a student be removed from campus.  But that reasonable belief in deference does not extend to the level of force that they may use to accomplish the removal.  *See*, *e.g.*, *Acosta v. City of Costa Mesa*, 718 F.3d 800, 826 (9th Cir. 2013) (per curiam) (analyzing separately a claim of unreasonable seizure or arrest and "whether the officers employed excessive force when enacting the seizure and arrest").  The officers violated the Fourth Amendment by handcuffing C.B., and they are not protected from C.B.'s excessive force claim by qualified immunity.  None of the reasons motivating the Supreme Court's decision in *T.L.O.* bears on police officers' use of force.  Neither the need for compliance with school rules, nor the close relationship between teachers and students, nor the importance of maintaining the educational environment has any connection with the amount of force permissibly used by

officers in carrying out an otherwise reasonable request from school officials.

The Supreme Court was explicit in *Graham v. Connor*, 490 U.S. 386, 396 (1989), that the application of Fourth Amendment reasonableness to excessive force claims "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." C.B. was not charged with or suspected of any crime. There is no evidence that C.B. posed an immediate safety risk to himself, to the officers, or to anyone else on the scene. And there was no testimony that C.B. tried to escape, nor did the officers believe that there was any reasonable possibility that he could or would attempt to do so. Finally, the officers' unreasonable decision to use handcuffs was compounded by their decision to leave the handcuffs on during a 30-minute trip in which C.B. was secured in the back of a police cruiser with no possibility of escape or harm to himself or others.

The Supreme Court's jurisprudence has firmly established that the force police officers apply must be reasonable. Under the totality of the circumstances, it was not reasonable to handcuff a small and docile 11-year-old child. The Supreme Court's law requiring that a reasonable level of force be used against the citizenry is crystal clear and well established.

BERZON, Circuit Judge, with whom Judge THOMAS joins, concurring in part and dissenting in part:

I concur in Judge Paez's opinion, with one exception: as to C.B.'s unlawful seizure claim, I concur in the result reached by Judge Paez but would reach that result via different reasoning.

As to the seizure issue, the reliance on *New Jersey v. T.L.O*, 469 U.S. 325 (1985), in the three other opinions in this case is, in my view, entirely beside the point. The police officer defendants have consistently maintained that they seized C.B. because they had reasonable cause to believe he was a child covered by California Welfare and Institutions Code section 601(a). But section 601(a) does not cover C.B.'s circumstance, nor could a reasonable police officer have thought it did. As the defendants have never suggested that they could, or did, seize C.B. to enforce the school's own rules and disciplinary needs, we should be reviewing their actual defense, not manufacturing one for them.

## I.

We are reviewing a judgment entered after a jury trial. Over the course of that trial, the police officers repeatedly explained that they took C.B. into custody pursuant to the Welfare and Institutions Code. Officer Prock, for example, acknowledged that he "arrest[ed]" C.B. under section 601. So did Officer McIntosh. The officers' expert witness testified as to whether the circumstances allowed them to take C.B. into temporary custody under section 601(a).

Furthermore, the testimony at trial established that at the time of C.B.'s seizure, the understanding of both the officers

and the school was that he was being put in handcuffs and carried away for law enforcement or mental health reasons, not school discipline. C.B. thought he was going to jail; no one told him otherwise. Coach Sinclair testified that she "[a]bsolutely" believed the officers were taking C.B. to the hospital pursuant to Welfare and Institutions Code section 5150, which enables a "peace officer" to take a person into custody for seventy-two hours when there is probable cause to believe the person "is a danger to others, or to himself," "as a result of a mental health disorder."[1] Officer Prock testified that the plan was to take C.B. to the probation department before releasing him to a family member. *See* Cal. Welf. & Inst. Code § 626(d). It was only *after* C.B. was seized that Officer Prock realized that he had a prior existing business relationship with C.B.'s uncle and so decided, with Chief McIntosh's permission, to drive C.B. directly to the uncle's home.

In closing argument, counsel for the officers pointed the jury to sections 625 and 601 of the Welfare and Institutions Code and described this statutory authority as their "primary defense" to C.B.'s constitutional claims. As to the unconstitutional seizure claim, counsel for the officers explained: "[W]e're saying that the law authorizes us to take the plaintiff into custody without a warrant because he's beyond the control of his guardian." Counsel for the officers went on to argue that the evidence showed C.B. was "beyond the control of the school," and that the officers were for that reason "allowed to take him into temporary custody without

---

[1] That such a seizure would have required probable cause was clearly established and beyond dispute by 2008. *See Bias v. Moynihan*, 508 F.3d 1212, 1220 (9th Cir. 2007).

a warrant . . . . under the Welfare [and] Institutions Code [sections] 625 and 601."

The jury was instructed in accord with the proffered defense that "seizure . . . without an arrest warrant is reasonable if the officers . . . had probable cause to believe that the person was subject to temporary custody without a warrant," and that "[w]hether the defendant officers had probable cause to conclude that [the] plaintiff was a juvenile who was subject to temporary custody *under the Welfare [and] Institutions Code*, as that law is described in these circumstances, should be determined by you under the totality of the circumstances."[2]  (Emphasis added.)

After the jury returned a verdict in favor of C.B., the officers moved for judgment as a matter of law on the ground that they were entitled to qualified immunity for C.B.'s unlawful seizure claim.  Their argument was that "the officers were authorized to take [C.B.] into custody under [s]ection 625 and 601 of the California Welfare and Institutions Code."

On appeal, the police officers continue to maintain that they took C.B. into "temporary custody under Welfare [and] Institutions Code sections 601 and 625."  They contend that they "arrested Plaintiff C.B." pursuant to this statutory authority "based on reasonable cause to believe C.B. was beyond the control of the school."  And, although the three other opinions in this case cite *T.L.O.* as alternately barring or justifying C.B.'s seizure, the officers themselves in their appellate filings *have never cited T.L.O. at all*.  In their response to the petition for rehearing en banc, the officers noted that the panel opinion "accurately identif[ied] Section

---

[2] The officers offered no objection to this instruction.

601(a) and 625(a) as the authority invoked and relied upon by the Officers[ ] in taking C.B. into temporary custody."

Simply put, the police officers are defending against C.B.'s allegations on the ground that they behaved as law enforcement officers, not school administrators or officials, when they arrested C.B. pursuant to their asserted statutory authority to do so. The officers do *not* purport to have been enforcing school disciplinary policies as agents of the school. We should not be evaluating the officers' seizure of C.B. by recourse to a justification that they neither offer as authority for their conduct nor endorse.

## II.

The officers' sole contention, then, is that they had cause to take C.B. into custody because he was "beyond the control of" his "custodian" under section 601(a). They had no such cause for two reasons: (1) the school is not C.B.'s custodian, and (2) he was not "beyond the control" of his parents, guardian, or custodian.

Subsections (a) and (b) of section 601 provide:

> (a) Any person under the age of 18 years who persistently or habitually refuses to obey the reasonable and proper orders or directions of his or her parents, guardian, or custodian, or who is beyond the control of that person, or who is under the age of 18 years when he or she violated any ordinance of any city or county of this state establishing a curfew based solely on age is within the jurisdiction

of the juvenile court which may adjudge the minor to be a ward of the court.

(b) If a minor has four or more truancies within one school year as defined in Section 48260 of the Education Code or a school attendance review board or probation officer determines that the available public and private services are insufficient or inappropriate to correct the habitual truancy of the minor, or to correct the minor's persistent or habitual refusal to obey the reasonable and proper orders or directions of school authorities, or if the minor fails to respond to directives of a school attendance review board or probation officer or to services provided, the minor is then within the jurisdiction of the juvenile court which may adjudge the minor to be a ward of the court. However, it is the intent of the Legislature that no minor who is adjudged a ward of the court pursuant solely to this subdivision shall be removed from the custody of the parent or guardian except during school hours.

As Judge McKeown concluded in her dissent to the original panel opinion in this case: "On its face, the term 'custodian' does not apply to school officials." *C.B. v. City of Sonora*, 730 F.3d 816, 828 n.2 (9th Cir. 2013) (McKeown, J., dissenting). When the California legislature referred to school authorities in section 601, it did so expressly, in subsection (b). That subsection delineates the precise circumstances under which the juvenile court may assert jurisdiction over a minor for misbehavior at school.

Of particular relevance to C.B.'s situation, subsection 601(b) specifies that a minor may come under the juvenile court's jurisdiction "[i]f . . . a school attendance review board or probation officer determines that the available public and private services are insufficient or inappropriate . . . to correct the minor's persistent or habitual refusal to obey the reasonable and proper orders or directions of school authorities." Cal. Welf. & Inst. Code § 601(b). C.B.'s "refusal to obey the . . . orders or directions of school authorities" spurred his seizure. But there was no "determin[ation]" made by those statutorily empowered to do so that "available . . . services [were] insufficient" to correct C.B.'s disobedience. And there certainly was no determination made that C.B.'s disobedience was "persistent or habitual." Accordingly, the provision of section 601 which specifically applies to schools does not support C.B.'s seizure. The officers do not argue that it does.

The complete absence from subsection (b) of a provision allowing a juvenile court to assert jurisdiction over a minor who "is beyond the control" of school authorities without a proper determination being made by the appropriate persons is telling. As "judicial interpreter[s]," we are "call[ed] on . . . to consider the entire text, in view of its structure and of the physical and logical relation of its many parts." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012). When confronted with a general provision and a specific provision that cannot be reconciled, the specific provision prevails. *Id.* at 183. Here, *even if* school authorities are properly considered C.B.'s custodian's during school hours, subsection (b) is the more specific provision, and so must govern. Otherwise, whenever a minor "persistently or habitually refuses to obey the reasonable and proper orders or directions" of school authorities, he could be

within the juvenile court's jurisdiction, leaving subsection (b)'s procedural requirement a nullity.

That subsection (a) does not include minors who are beyond the control of school authorities is confirmed by review of the statute's legislative history. An earlier version of section 601 expressly applied to minors who were "beyond the control of" "school authorities." That version of the statute read in full:

> Any person under the age of 21 years who persistently or habitually refuses to obey the reasonable and proper orders or directions of his parents, guardian, custodian or *school authorities*, or who is beyond the control of such person, or any person who is a habitual truant from school within the meaning of any law of this State, or who from any cause is in danger of leading an idle, dissolute, lewd, or immoral life, is within the jurisdiction of the juvenile court which may adjudge such person to be a ward of the court.

1961 Cal. Stat. 3471 (emphasis added); *see also In re David S.*, 12 Cal. App. 3d 1124, 1126 (Ct. App. 1970). In 1974, the legislature amended section 601 by deleting "school authorities," as well as "or any person who is a habitual truant from school within the meaning of any law of this state." 1974 Cal. Stat. 2629. Section 601 was amended by the same bill that added Article 9 to Chapter 6 of Division 9 of the Education Code, creating "School Attendance Review Boards." 1974 Cal. Stat. 2624. The legislature's "intent" "[i]n enacting this article . . . [was] that intensive guidance and coordinated community services. . . be provided to meet

the special needs of pupils with school attendance problems or school behavior problems." *Id.*

At the same time, and as part of the same legislation that created school attendance review boards and that amended section 601, the legislature added section 601.1 to the Welfare and Institutions Code. 1974 Cal. Stat. 2629. That section specifically governed disobedience of school authorities, and required "persistent[] and habitual[] refus[al]" in order for a minor to be "beyond the control of such authorities":

> (a)     Any person under the age of 18 years who persistently or habitually refuses to obey the reasonable and proper orders or directions of school authorities, and is thus beyond the control of such authorities, or who is a habitual truant from school within the meaning of any law of this state, shall, prior to any referral to the juvenile court of the county, be referred to a school attendance review board pursuant to Section 12404 of the Education Code.

> (b) If the school attendance review board determines that the available public and private services are insufficient or inappropriate to correct the insubordination or habitual truancy of the minor, or if the minor fails to respond to directives of the school attendance review board or to services provided, the minor is then within the jurisdiction of the juvenile court which may adjudge such person to be a ward of the court.

*Id.*  The legislature thus required that minors who disobey school authorities be referred to a school attendance review board before coming within the juvenile court's jurisdiction.

In the context of this legislative scheme, it is clear that the deletion of "school authorities" and "habitual truan[cy]" from section 601 was a purposeful excision.  The legislature's considered judgment was that school discipline and attendance problems should go to the school attendance review boards before the child is referred to juvenile court, and that only "persistent[] or habitual[] refus[al] to obey . . . school authorities" would suffice.  As already discussed, the present version of 601 embodies this same basic structure.

In sum, "custodian" and "school authorities" have long held separate meanings in this statute.  The non-inclusion of minors who are beyond the control of school authorities from section 601(a) was no mistake.

There is still more evidence of the total implausibility of the officers' interpretation of section 601.  The current provision requires that minors adjudged a ward of the court under subsection (b) may only be removed from a parent or guardian during school hours.  If "custodian" in subsection (a) *includes* school authorities, then a minor may be removed from his home if he is adjudged a ward of the court for "persistently or habitually refus[ing] to obey" school authorities or, as here, for being "beyond the control of" school authorities — a result plainly contrary to subsection (b)'s considered prohibition against such a practice.  Thus, even if custodian is a general term that could, in some circumstances, encompass school officials, the context in which the term appears and the evolution of the statute indicate that it does not serve this role in section 601.

Moreover, *all* the cases applying 601(a) to minors who disobey or are beyond the control of their *custodians* refer to persons charged with overall custody of a minor, not school officials. *See, e.g.*, *In re Ronnie P.*, 10 Cal. App. 4th 1079, 1083 (Ct. App. 1992); *In re Rita P.*, 12 Cal. App. 3d 1057, 1059, 1060 (Ct. App. 1970). Where "custodian" appears elsewhere in the California Welfare and Institutions Code and the cases applying it, review of its use illustrates that it does not refer to schools.

For example, Welfare and Institutions Code section 777 requires a noticed hearing before "changing or modifying a previous order by removing a minor from the physical *custody* of a parent, guardian, relative, or friend." Cal. Welf. & Inst. Code § 777 (emphasis added). And section 601(a)'s grouping of custodian with "parents" and "guardian" is replicated in *Ex parte Moilanen*, which holds that "[p]arents, guardians or others in whose custody a minor child may be found, are entitled to notice of hearings in proceedings instituted for the purpose of separating children from custodian[s]." 104 Cal. App. 2d 835, 842 (Dist. Ct. App. 1951). School administrators and authorities generally do not have the type of liberty interest in their relationship with their students that carries due process protection.

Finally, a minor, even one identified as a "runner," cannot properly be deemed "beyond the control of" his custodian for refusing to come inside after recess on a single occasion. As Judge Paez recounts, examination of the cases interpreting section 601(a) illustrates that this section mostly applies to runaways — minors who are quite literally "beyond the control" of their parents, guardians, or custodians, and for that reason properly may be adjudged a ward of the state. *See, e.g.*, *In re Bettye K.*, 234 Cal. App. 3d 143, 150 (Ct. App.

1991); *In re Ronald S.*, 69 Cal. App. 3d 866, 872 (Ct. App. 1977) ("As a matter of fact, the overwhelming number of 601's are runaways."); *In re D.J.B.*, 18 Cal. App. 3d 782, 787 (Ct. App. 1971); *In re David S.*, 12 Cal. App. 3d at 1128; *In re Rita P.*, 12 Cal. App. 3d at 1059. Construing "beyond the control of" a parent, guardian, or custodian to mean a single incident of misbehavior, such as sitting on a bench non-responsively and refusing to come indoors, would eviscerate the critical requirement that out-of-control conduct amounting to disobedience must be "persistent[] or habitual[]" to fall under 601(a)'s purview.

In sum, section 601(a) has not been applied to include and does not include a single act of defiance of school officials. The officers simply had no cause to take C.B. into custody under this provision.

## III.

Nor does qualified immunity insulate the officers from C.B.'s Fourth Amendment claims.

"A police officer, who violates another's constitutional right, will receive qualified immunity from suit under 42 U.S.C. § 1983 if the right the officer violated was not protected by clearly established law at the time he acted." *A.D. v. California Highway Patrol*, 712 F.3d 446, 449 (9th Cir. 2013). "To be *clearly* established, the . . . law only must have been sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] [a constitutional] right." *Id.* (internal quotation marks omitted, all but first alteration in original).

"By defining the limits of qualified immunity essentially in objective terms," the aim is not to "license . . . lawless conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). To the contrary: "Where a reasonable official could be expected to know that certain conduct would violate . . . constitutional rights, he should be made to hesitate." *Id.* The standard of objective legal reasonableness thus acts to safeguard "[t]he public interest in deterrence of unlawful conduct and in compensation of victims," without tying the hands of officials acting in situations "in which clearly established rights are not implicated." *Id.*

The officers do not argue that, because he was a student, C.B. had no Fourth Amendment protections. Nor could they: Students do not "shed their constitutional rights . . . at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969); *see T.L.O.*, 469 U.S. at 336. Thus, the clearly established law at issue in this case is the Fourth Amendment right to be free from unreasonable seizures and, more particularly, its individualized suspicion requirement. This constitutional guarantee protects "the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Terry v. Ohio*, 392 U.S. 1, 9 (1968).

When law enforcement officials effect a seizure of a person without a warrant, as the officers did here, the reasonableness requirement generally is satisfied if probable cause exists to believe the person is violating the law. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 625, 624 (1989); *Beier v. City of Lewiston*, 354 F.3d 1058, 1071 (9th Cir. 2004). But a warrantless seizure may, in narrow circumstances, survive Fourth Amendment scrutiny where

probable cause does not exist. *T.L.O.*, 469 U.S. at 340. In such circumstances, involving, for example, the need to investigate and deter possible criminal activity, seizures based on "reasonable" suspicions not rising to the level of probable cause satisfy the Fourth Amendment. *Terry*, 392 U.S. at 22.

That the Fourth Amendment guarantee is secured in general terms does not assure the officers immunity: "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). And while the general terms of the Fourth Amendment's proscription against unreasonable seizures call out for further specificity, *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011), case law provided this further specificity by the time of C.B.'s 2008 seizure.

By 2008, the law was clearly established that the constitution requires police officers to have *some* legal cause to take children into custody. *Crowe v. County of San Diego* held that a police officer was not entitled to qualified immunity for a claim that the 1998 detention of two children after the murder of the children's sister violated the children's Fourth Amendment rights, as the officer "failed to provide any justification" for the children's seizure, 608 F.3d 406, 439 (9th Cir. 2010); *Henderson v. Mohave County* rejected law enforcement's assertion that qualified immunity protected them against a section 1983 suit for taking a child into custody, even for the purpose of transporting the child from one parent to another, where there was "no excuse" for the officers' seizure of the child, 54 F.3d 592, 595 (9th Cir. 1995).

Here, the officers acknowledged that their seizure of C.B. amounted to an arrest. In assessing the circumstances under which a law enforcement officer may take a child into temporary custody for being "beyond the control" of a parent, guardian, or custodian, the California legislature arrived at a reasonable cause standard. Cal. Welf. & Inst. Code § 625(a). Thus, when law enforcement officers have reasonable cause to believe a child falls within the ambit of section 601, they may hold the child in temporary detention. *Id.* As the officers explained during their testimony, this temporary custody could involve transferring custody to the probation department or to a private shelter. Cal. Welf. & Inst. Code § 626.

In my view, the police officers could not reasonably have believed that they had cause, reasonable or otherwise, to take C.B. into custody under section 601(a). I will therefore assume that the state statute's adoption of a reasonable, rather than probable, cause standard, is consistent with the constitutional guarantee, and will further assume that "reasonable cause" is less than "probable cause," which is not self-evident. Still, if the officers could not reasonably have believed *some* cause existed under section 601(a), qualified immunity offers them no protection.

No reasonable officer would have believed that he had any cause to take C.B. into custody pursuant to section 601. The officers were told that that day C.B. was "out of control," a runner who had not taken his medication, and, in response to questioning, that he was not wanted on school grounds. But Sonora Elementary obviously was not C.B.'s parent,

guardian, or custodian: For the reason I have explained, there is just no sensible reading of the statute otherwise.[3]

Moreover and separately, the officers' account assuredly did not provide reasonable cause to believe C.B. "*persistently* or *habitually* refuse[d] to obey . . . reasonable and proper orders or directions." Cal. Welf. & Inst. Code § 601(a). Nor did it provide reasonable cause to believe that C.B. was "beyond the control" of *anyone.* California law is clear that a single act of defiance is generally insufficient to find that a minor is beyond the control of a parent, guardian, or custodian absent some extraordinarily serious act of defiance. *See* Paez, J., Opin. at 43–44 (citing *In re David S.*, 12 Cal. App. 3d at 1128 (holding that a minor who had told his mother he would be spending the weekend with friends about 40 miles from home but who was actually found about 600 miles away from home attempting to cross the border into Mexico was beyond the control of his parents) and *In re Bettye K.*, 234 Cal. App. 3d at 149).

In short, there was *no* cause, probable, reasonable, or otherwise, to take C.B. into temporary custody under section 601, and no reasonable officer could have believed otherwise.

As the defense proffered by the officers in this case confirms, law enforcement officers enforce the law, not run-of-the-mill school discipline.[4]  And law enforcement officers

---

[3] While there was testimony from the defense expert witness that the police officers were trained otherwise, flatly erroneous training does not establish qualified immunity.  *See Cal. Att'ys for Criminal Justice v. Butts*, 195 F.3d 1039, 1049–50 (9th Cir. 1999).

[4] *T.L.O.* notes this distinction.  469 U.S. at 341 n.7.

alone are authorized to take a child into temporary custody upon reasonable cause to believe the child is in violation of section 601(a). Cal. Welf. & Inst. Code § 625. Because there was no cause to believe C.B. could be detained under these Welfare Code provisions, and no reasonable officer could believe that there was, I would affirm the judgment for C.B. on these grounds. I would not manufacture a T.L.O.–based law-enforcement-officers-as-school-disciplinarians defense never argued to the jury, or us.